# Cloverdale Homes *v.* Town of Cloverdale.

## *Mandatory Injunction.*

(Decided June 12, 1913.   Rehearing denied June 30, 1913.
62 South: 712.)

1. *Statutes; Construction; Common Law.*—The common law being the basis upon which all of the laws of the state have been constructed, its statutes must be construed in the light of the common law.

2. *Same; Presumption Against Change.*—The presumption is indulged that the Legislature did not intend to make any alteration in the law beyond what it declared expressly or by necessary implication; hence, general words and phrases, however comprehensive in their literal sense must be construed as strictly limited to the immediate objects of the act, and as not altering the general principles of the law.

3. *Dedication; Operation; Abutting Owner; Statutes.*—In view of the provisions of sections 6028, 6029, 6030, 6031-2, Code 1907, an owner of land who divides it into town lots, and by his map certified, signed, acknowledged and recorded, dedicates certain parts of it to the public use for streets and alleys, retains the fee to the center of such streets and alleys, subject to the public easement.

4. *Municipal Corporation; Streets; Fee.*—Under the rule that the title should reside somewhere, and on the ground that it furnished him a means of protection against any unwarranted appropriation of a street on which the situation of his property gave him an interest, the ultimate fee to the center of the street was in the abutting landowner at common law.

5. *Same; Character and Extent of Public Use.*—While the public have only an easement in the streets of a city, such easement is paramount, and the right of the public to pass over it extends over every part of it, from side to side and end to end, to be used not only by vehicles in use at the time of its dedication, but such other reasonable methods of conveyance as may be developed in the future, provided it does not tend to destroy the street as a means of travel common to all; the growth of the city increases the public demand, and broadens the rights of the public in both the surface and the sub-surface, and diminishes correspondingly the rights of the abutting owner in the street, the word "street" meaning the whole surface, and so much of the depth of it as can or is used fairly for the ordinary purpose of a street, enabling the public authorities to raise it, and to place under it gas, water and sewer pipes.

6. *Same.*—An abutting owner of the fee to the middle of the street cannot put that part of the street to even a temporary use inconsistent with the public rights, unless there be some necessity therefor, but may use it for any legal purpose of his own which does not interfere with the dominant right of the public, such uses varying with the size of the municipality, and diminishing as the rights of the public increase; his use of the sub-surface can only be justified in respect to his reasonable need therefor, subject to reasonable police regulation, and to the paramount public right.

7. *Same; Use of Street; Excavation for Mains.*—The facts considered and it is held that in view of complainant's ownership in fee to the center of the street as an abutting owner, and its want of authority to carry on the business of a public service corporation, that the municipality would be enjoined from preventing a purchaser from complainant from laying a service pipe in the street so as to connect his premises with the gas main.

8. *Gas; Supply; Proper Purpose.*—While the plaintiff corporation developing a residence district and laying gas mains and pipes in the roads with the consent of the county board of revenue, could not, as a matter of right, maintain them in the streets of the respondent town, subsequently incorporated, the town might require such company to remove its gas pipe, or, upon payment of a just compensation, might condemn them to the use of the town, if necessary to secure gas for all of its residents of the same class upon equal terms.

9. *Same; Terms to Consumer.*—A public service corporation producing and supplying gas cannot furnish gas for one of the residents of a town and not furnish to all of the other residents occupying the same class, as all persons of the same class are entitled to gas upon the same terms.

APPEAL from Montgomery Chancery Court.

Heard before Hon. L. D. GARDNER.

Bill by the Cloverdale Homes against the town of Cloverdale for mandatory injunction to compel said town to permit certain joinders to gas mains laid in

its streets. From a decree for respondent on demurrer and on the merits, complainant appeals. Reversed and rendered.

The facts sufficiently appear in the opinion. The following are the ordinances referred to thereunder:

"Section 1. It shall be unlawful for any person, firm or corporation to make any excavation in, under or across any street, alley, highway, or other public place in the town of Cloverdale without a permit in writing from the town clerk.

"Sec. 2. Any person, firm or corporation who shall violate the provisions of section 1 of this ordinance shall on conviction be fined not less than $1 nor more than $100."

The following ordinance also appears:

"Section 1. That any person, firm or corporation who shall, at any time, desire to make any excavation in, under or across any street, alley, highway or public place in the town of Cloverdale shall first apply to the town clerk in writing for permit to make such excavation and shall, in the writing state, for what purpose the excavation is to be made, when it is to be made and by whom, and a permit in the same writing to restore the condition of the excavation as may be required.

"(2) For all ordinary purposes, such as water connections, etc., the town clerk is hereby authorized to issue a written permit, but if any important excavation is applied for, the town clerk shall refer the same to the town council and shall not issue permission for such excavation until the town council shall pass upon the same.

"(3) Before any permit is issued by the town clerk each applicant is required to place in his hands such sum as he may deem reasonable to have, not less, however, than $10, to be held by him as a guaranty that

said excavation shall be refilled in a proper satisfactory manner, and the condition of the street, alley, highway or other public place restored to its original condition, and if such applicant does not restore the condition of such public place within a reasonable time after excavation has been made, the town council or the town clerk acting for it shall have the right to use such money so deposited for the purpose of restoring the condition of said street, alley, highway or public place. If, however, the person making the excavation shall restore the original condition of the street satisfactorily to the town clerk, then the money so deposited shall be returned to the appellant."

Exhibit A referred to is as follows: "This agreement made and entered into on this the 16th day of September, 1908, by and between the Montgomery Light & Water Power Company, a corporation created and existing under the laws of the state of New Jersey, hereinafter designated as the party of the first part, and the Cloverdale Homes, a corporation created and existing under the laws of the state of Alabama, hereinafter designated as the party of the second part, witnesseth:

"(1) The party of the first part hereby agrees, in consideration of the covenants hereinafter made by the party of the second part, to allow the party of the second part to tap its street in the city of Montgomery, Alabama, with a four-inch gas main for the purpose of extending the gas main of the party of the second part along any streets said party of the second part may see fit to lay such gas main in the Cloverdale plat.

"(2) The party of the first part hereby agrees that if the property belonging to the Cloverdale Homes at the time of its incorporation or other property contiguous to it subsequently acquired should be taken into the city limits of Montgomery at any time, the party

of the first part will purchase from the party of the second part such gas pipe as has been laid by the party of the second part, and to pay said party of the second part such amount as it would cost to duplicate such system of pipes at the time the sale is made. It is understood and agreed, however, between the parties to this instrument, that the party of the first part shall have the privilege of buying such pipe as may be owned by the party of the second part at any time it shall so desire, whether before or after the property of the Cloverdale Homes shall be included in the city limits of Montgomery, by paying to the Cloverdale Homes such an amount as it would take to duplicate the system at the time of sale. Should the parties of the first and second part be unable to reach an agreement as to the price to be paid by the party of the first part to the party of the second part in the event a sale should be made under the provisions of the two preceding paragraps of section numbered 'Second,' the price shall be fixed by three disinterested arbitrators, two of whom shall be selected by the parties to this agreement, each party selecting one arbitrator, and the third to be chosen by the two thus selected, and the price so fixed by said arbitrators shall be binding upon each of the parties to this agreement the same as if said price had been named in this agreement.

"(3) It is agreed between the parties hereto that the party of the second part shall have the right to charge any property owner such amount as may be agreed upon between the party of the second part and such property owner for the privilege of making connection with the main of the party of the second part.

"(4) It is further agreed between the parties hereto that the party of the second part shall have the exclusive right of laying pipe lines throughout the property

[Cloverdale Homes v. Town of Cloverdale.]

owned by the party of the second part at the time of its incorporation and property contiguous thereto subsequently acquired by the party of the second part, and the party of the second part shall also have the exclusive right of laying pipe lines throughout what is at present known as 'Cloverdale,' the agreed boundaries of which are shown on the plat hereto attached and made a part of this agreement. The party of the first part hereby agrees with the party of the second part that it will not lay or cause to be laid any gas pipe in the property of the Cloverdale Homes, or in Cloverdale, until the pipe of the party of the second part shall have been acquired by the party of the first part.

"(5) It is further agreed between the parties hereto that all connections to said mains shall be made by the party of the first part, and that no connection shall be made until persons desiring connections shall have filed with the party of the first part written permission from the party of the second part for such connections to be made.

"(6) The party of the first part hereby reserves the right to supervise the laying of said pipe, and the party of the second part agrees that such pipe shall be laid under the supervision of the party of the first part, and the party of the second part agrees to pay such reasonable charges as shall be made by the inspector who shall inspect said work, and agrees that the party of the first part shall select such inspector.

(7) It is further agreed that the party of the first part shall assess and collect all charges for the use of gas by parties using the gas by connection with the lines of the party of the second part. And the party of the first part agrees, in consideration of its being allowed to assess and collect such charges, that the party of the second part shall be allowed to make said con-

nection at the intersection of the Norman Bridge road and Felder street without charge to the party of the second part.

"(8) It is further agreed that the party of the first part shall have such general powers and supervision over said pipes for the purpose of blowing them out, repairing them and doing such other things as are necessary to be done in order that consumers may be given good service and for the purpose of fixing and collecting charges for service as it has under its charter over its own pipe lines in the city limits of Montgomery, Alabama.

"In witness whereof, the party of the first part has caused this instrument to be signed by R. J. Chambers, as its second vice president and general manager, and has caused the same to be attested by V. B. Day, as its secretary; and the party of the second part has caused the same to be executed by F. Stollenwerck, as its president, and the same to be attested by A. W. Le Bron, as its secretary, on this the day and year above written. Executed in duplicate."

J. MANLY FOSTER, for appellant. The Montgomery Light & Water Power Company is a public service corporation, with right of condemnation, and with express authority to use the public road in the construction of its lines.—Secs. 3486, 3493, Code 1907. The only real question is whether the owners of abutting lots have a right, as incident to such ownership, to make minor, temporary excavations to connect service pipes with gas, water and sewer mains, reasonably necessary to improve their lots for residence or business purposes, so as not to materially interfere with the dominant use of the public. This must be answered in the affirmative. —Elliott on Roads & Streets, sec. 690; 36 S. W. 1073;

32 L. R. A. 857; 13 L. R. A. (N. S.) 904; 34 L. R. A. (N. S.) 506. The rights of abutting property owners are special property interests, the enjoyment of which the law will protect against arbitrary deprivations by the representatives of the public.—48 Am. Rep. 457; 58 L. R. A. 782; Id. 775; 39 L. R. A. 751; 24 L. R. A. 507; 8 L. R. A. (N. S.) 422. At all times the abutting owner retains the interest in the street that is not needed for public uses, subject, however, to municipal or police regulations.—37 Cyc. page 2, paragraphs 207.and 308. The abutting owner has the right to construct a driveway from his premises to the traveled part of the street, and a permit to do so cannot be lawfully refused.—*Goodfellow Tire Co. v. Hurlburt,* 30 L. R. A. (N. S.) 1074; *Metcalf v. Boston,* 33 N. E. 586. He also has the right to connect his premises with a bridge in the street.— *Sandpoint v. Doyle,* 17 L. R. A. (N. S.) 497. He has the right to lay a drain in the street.—*Homes v. Montgomery,* 34 L. R. A. (N. S.) 506. He has a right to lay a sidewalk, though when reasonable regulations have been made as to laying sidewalks, he must follow such regulations.—*Georgetown v. Hammerick,* 13 L. R. A. (N. S.) 1113. He has the right to excavate for pipes, and he cannot be required to take out a franchise for laying such pipes for his own use.—*Colegrove Water Co. v. Hollywood,* 13 L. R. A. (N. S.) 904. He has the right to make such use of the streets as are ordinarily made in building and improving abutting lots, keeping always in view the superior right of the public of passage.—*Graves v. Shettuck,* 69 Am. Dec. 536. This court is in accord with the doctrine of the cases cited above. —*Costello v. State,* 108 Ala., on pages 49 and 50. Acts which interfere with the carrying on of complainant's business, or with the use of his property, destroying his custom, his credit, or his profits, do an irreparable in-

jury and authorize the issuance of an injunction.—22
Cyc. 765. Where the consummation of a wrongful act
will result probably in many disputed claims and many
actions at law against complainant, his remedy at law
is inadequate, and he is entitled to the protection of
equity by injunction.—22 Cyc. sec b, page 766. Injunc-
tion will lie where an injury committed by one against
another is continuous or being constantly repeated, so
that complainant's remedy at law requires the bringing
of many successive actions, especially where the facts
complained of constitute a willful invasion of complain-
ant's rights.—*Birmingham Traction Co. v. So. Bell T.
& T. Co.,* 119 Ala. 144; *Bank v. Tyson,* 133 Ala. 477;
*Dennis v. M. & M. Ry. Co.,* 137 Ala. 657; *Blondell v.
Con. Gas Co.,* 46 L. R. A. 187. The remedy at law is
inadequate and the injury irreparable whenever the in-
jury is of a peculiar nature so that compensation cannot
be had.—*Deegan v. Neville,* 127 Ala. 471; *Christian
Church v. Sommer,* 149 Ala. 245.

C. H. ROQUEMORE, and E. T. GRAHAM, for appellee.
The right to lay gas mains is a franchise which can only
be granted by the Legislature, or some municipal au-
thority empowered by them.—2 Dill. Mun. Corp. 691.
It does not belong to the citizens of the county general-
ly by common right.—10 Wall. 51; 41 Fed. 265. Hence,
the individual or corporation who lays its pipe in the
country or suburban highway is liable for damages to
owners of the land through which the pipes are laid,
and such owners may tear up and remove the pipe.—
1 A. & E. Enc. of Law, 239; 14 Ib. 933; 39 N. E. 423;
19 Am. St. Rep. 113. There are two essentials to enable
a corporation to acquire the right to do a gas business.
First, a charter from the state, and the second is a
franchise or permission from the city.—2 Dill. Mun.

Corp. sec. 691, and notes; 14 A. & E. Enc. of Law, 916; 29 N. E. J. 242; 18 Ohio State 62; 32 Barb. 358. It doesn't matter whether the fee in the street is in the abutter or municipality.—19 L. R. A. 643; 2 Dill. Mun. Corp. sec. 644-a; 4 McQuillian Mun. Corp. 3651. A public service corporation will supply all the public equally.—*City of Montgomery v. Greene,* 60 South. 900; *Ferguson v. Bir. Water Wks. Co.,* 164 Ala. 586; 40 Cyc. 791-801; 14 L. R. A. 424; 171 Mo. 615. The attempt of the Homes Company to sell and convey rights and privileges in the streets was a nullity.—*Chambers v. Talladega,* 126 Ala. 296; *Webb v. Demopolis,* 95 Ala. 136; *Harn v. Dadeville,* 100 Ala. 202; 28 Cyc. 175.

DE GRAFFENRIED, J.—The question involved in this case require us to construe section 6030 of the Code of 1907, which is as follows:

"The acknowledgment and recording of such plat or map shall be held in law and in equity to be a conveyance in fee simple of such portion of the premises platted as are marked or noted on such plat or map as donated or granted to the public, and the premises intended for any street, alleyway, common, or other public use, as shown in such plat or map, shall be held in trust for the uses and purposes intended or set forth in such plat or map."

It is necessary, in order that the provisions of the above section 6030 may be fully understood, that the provisions of that section be read in connection with the following other sections of the Code:

"6028 (3899). Town lots; survey and plat.—Any person desiring to subdivide his lands into lots shall cause the same to be surveyed by a competent surveyor, if not already surveyed, and shall cause a plat or map thereof to be made, showing the subdivisions into which

[Cloverdale Homes v. Town of Cloverdale.]

it is proposed to divide the same, giving the length and bearings of the boundaries of each lot and its number; and if it be the purpose of the owner to divide the lands into town lots, such plat or map shall show the streets, alleys, and public grounds, and give the bearings, length, width, and name of each street, as well as the number of each lot and block. Such plat or map must show the relation of the lands so platted or mapped to the government survey."

"6029 (3900). Plat to be certified, signed by owner, acknowledged, and recorded; evidence.—The plat or map having been completed, shall be certified by the surveyor, which certificate must also be signed by the owner, his duly authorized agent or attorney, and acknowledged by such owner, agent, or attorney, in the same manner in which deeds are required to be acknowledged. The plat or map, together with the certificate of the surveyor and of acknowledgment, shall be recorded in the office of the judge of probate in the county in which the lands are situated, in a suitable book to be kept for that purpose; and such acknowledgment and record shall have like effect, and certified copies thereof and of such plat or map may be used in evidence to the same extent and with like effect as in the case of deeds."

The common law is the base upon which all of the laws of this state have been constructed, and when our courts are called upon to construe a statute—when they are called upon to ascertain and declare the legal effect and meaning of a legislative enactment—they must read the statute in the light of the common law.

At common law the ultimate fee to the middle of the street was in the abutting landowner. There was reason underlying the above rule of the common law, for the ultimate fee in lands should reside somewhere, and, where it resides in the abutting landowner to the

middle of a street, it furnishes to that landowner an efficient weapon for his protection against an unwarranted appropriation of a street in the proper maintenance of which the situation of his property gives him a peculiar interest.  Through this doctrine of the common law this court has been able to meet and determine, with justice to the owners of lands abutting upon streets and to the public to whose use such streets are devoted, each question which the constant growth of municipalities and the rapid and continuing advancement of human activity has developed. In fact, through this principle, this court has, meeting the wants of the state as it has proceeded in its various stages of development, declared a system possessing sufficient elasticity, and at the same time sufficient certainty to meet any demand which each improved system of communication and transportation and each modern condition and need of human life has made upon it.—*Perry v. N. O., Mobile & Chattanooga R. R. Co.,* 55 Ala. 413, 28 Am. Rep. 740; *Western Railway of Alabama v. Ala. G. T. R. R. Co.,* 96 Ala. 272, 11 South. 483, 17 L. R. A. 474; *Highland Ave. & Belt Ry. Co. v. Matthews,* 99 Ala. 24, 10 South. 267, 14 L. R. A. 462; *Birmingham Ry., L. & P. Co. v. Smyer,* 181 Ala. 121, 61 South. 354.  The common-law rights of a citizen occupy a high plane of sanctity for they are inherited rights.

For this reason it is a general rule of construction of statutes that "there are certain objects which the Legislature is presumed not to intend; and a construction which would lead to any of them is therefore to be avoided.  It is found sometimes necessary to depart, not only from the primary and literal meaning of words, but also from the rules of grammatical construction, when it is improbable that they express the real intention of the Legislature; it being more reasonable to hold

that the Legislature expressed its intention in a sloven-
ly manner than that it intended something which it is
presumed not to intend.

"One of these presumptions is that the Legislature
does not intend to make any alteration in the law be-
yond what it explicitly declares, either in express terms
or by unmistakable implication; or, in other words, be-
yond the immediate scope and object of the statute. In
all general matters beyond, the law remains undisturb-
ed. It is in the last degree improbable that the Legis-
lature would overthrow fundamental principles, in-
fringe rights, or depart from the general system of law
without expressing its intention with irresistible clear-
ness; and to give any such effect to general words, sim-
ply because, in their widest and perhaps natural sense,
they have that meaning, would be to give them a mean-
ing in which they were not really used. It is there-
fore an established rule of construction that general
words and phrases, however wide and comprehensive
in their literal sense, must be construed as strictly lim-
ited to the immediate objects of the act and as not alter-
ing the general principles of the law; i. e., they are to be
construed as near the use and reason of the prior law as
may be without violation of their obvious meaning."—
Endlich, Interp. Stat. p. 151, § 113.

In the case of *Cecilia Thomas v. R. H. Hunt*, 134 Ma.
392, 35 S. W. 581, 32 L. R. A. 857, which is cited by
counsel for appellant in his brief, the Supreme Court
of Missouri, construing a statute somewhat similar to
the above-quoted section 6030 of our present Code, said:
"The statute in force when the plat was filed provided
that such plats 'shall be a sufficient conveyance to vest
the fee of such parcels of land as are therein expressed,
named, or intended for public use in the county in which
such town, village, or addition is situate, in trust, and

for the uses therein named, express or intended, and for no other use or purpose.'—Rev. Stat. 1855, § 8, p. 1536. Under this statute it has been held that the fee passes from the owner by the dedication.—*Hannibal v. Draper,* 15 Mo. 634; *Reid v. Edina Bd. of Edu.,* 73 Mo. 304. * * * Considering the policy of the law, as before stated, to be that the owners of property abutting on a street own the fee also to the center of the street, subject to the easement, it is clear to us that the statute was intended to effect the same purpose; that is, while the fee passed out of the dedicator and vested in the county, the public only secured an easement, and the abutting owners, respectively, the beneficial right in the land to the center of the street. This seems to be the view taken in the *Snoddy Case,* 122 Mo. 491, 25 S. W. 932, 24 L. R. A. 507, and 122 Mo. 493, 24 S. W. 142, 24 L. R. A. 512, though what is there said may be considered only dicta. We are therefore of the opinion that by the statutory dedication of Tracy street the fee to the land passed out of the dedicators, and the ownership, subject to the easement, vested in the abutting owners, respectively, to the center of the street." To the same effect is a later decision of the Supreme Court of Missouri, rendered by that court in *Union Elevator Co. et al. v. Kansas City Suburban Ry. Co.,* 135 Mo. 353, 36 S. W. 1071. In that case the court said: "Counsel for defendant insist that the cases cited are predicated on the fact that the owners of the lots in question in those cases owned to the center of the alley or street, while in this case the fee of the streets was dedicated to the county of Jackson in trust for the public. Coates & Hopkins' addition to the city was platted, and the plat filed in the recorder's office of said county, on the 7th day of January, 1876. By it Henning and Hopkins streets were dedicated to the public, and the fee there-

in vested in the city for public purposes.—Gen. St. Mo. 1865, c. 44, § 8. By that statute it is not meant that an absolute fee in the streets is vested in the city, with the right of disposal by deed, but simply the right of their control for the use of the public. Whatever may be the ruling in other jurisdictions under similar conditions, the law as announced in this state is that the owner of land adjoining a street or alley owns the fee to the center of such street or alley, as the case may be, subject to an easement in the public." To practically the same effect are the cases of *Schurmeier v. St. Paul & Pac. R. R. Co.*, 10 Minn. 82 (Gil. 59), 88 Am. Dec. 59, and *Betcher v. Chicago, M. & St. P. Ry. Co.*, 110 Minn. 228, 124 N. W. 1096.

Taking into consideration the law as it had, through the entire history of this state, been declared by an unbroken line of decisions of this court to exist, we are clearly of the opinion that, when an owner of land divides his land into town lots and by his map, certified, signed, and acknowledged and recorded as required by section 6029 of the Code of 1907, dedicates certain parts of the said land to the public to be used for streets and alleys, an easement in the lands so dedicated for such purposes vests in the public, but the ultimate fee in the land, subject to such easement, remains in the abutting landowners to the center of such streets and alleys, and that section 6030 of the Code of 1907 was intended by the Legislature to so declare. Sections 6031 and 6032 of the Code of 1907, which provide methods whereby the provisions of sections 6028, 6029, and 6030 may be abrogated, clearly show that the construction which we have put upon said section 6030 was the construction which the Legislature placed upon that section when it called it into existence.

1. While, under the laws of this state, the public have only an easement in a street of a city, that easement is paramount and the right of the public to passage over a street extends over "every part of it, from side to side, and from end to end." The public acquires the right to use the street not only by means of vehicles in use at the time of the dedication of the street but also by such other reasonable methods of conveyance which in the future may be discovered, provided "such vehicles or modes do not exclude the proper use (of the street) by other modes or kinds of vehicles. Any use of the street for public travel, which is within the limits of the public easement, whether it be by old or new methods, provided it does not tend to destroy the street as a means of passage and travel common to all, is lawful and permissible."—*Birmingham R. L. & P. Co. v. Smyer, supra.*

The mere fact that an abutting landowner owns the ultimate fee to the middle of the street does not confer upon him the right to put that part of the street in which he owns such ultimate fee to even a temporary use which is inconsistent with all of the rights of the public in such street unless there is some necessity therefor. "The fee is entirely and completely subordinate to the dominant easement," and an invasion of the rights of the public in the street "can be justified only on the ground of necessity."—*Commonwealth v. Passmore,* 1 Serg. & R. (Pa.) 217; *Van O'Linda v. Lothrop,* 21 Pick. (Mass.) 292, 32 Am. Dec. 261; *Raymond v. Keseberg,* 84 Wis. 402, 54 N. W. 612, 19 L. R. A. 653.

As the abutter owns the fee to the middle of the street, he may, however, out of respect to the fact of his ownership, use that part of the street for any lawful purpose of his own when such use in no way interferes with any

of the dominant rights of the public. The word "street" means "the surface; it means the whole surface and so much of the depth as is or can be used not unfairly for the ordinary purposes of a street. It comprises a depth which enables the original authority to do that which is done in every street, namely, to raise the street and to lay down sewers, for at the present day there can be no street in a town without sewers, and also for the purpose of laying down gas and water pipes. 'Street,' therefore, in my opinion includes the surface and so much of the depth as may not unfairly be used as streets are used."—Butt, L. J., in *Cloverdale v. Charlton,* L. R. 4 Q. B. Div. 104; Dillon on Munic. Corp. (5th Ed.) p. 1692, § 1072, note.

"They (that is, the abutting owners) may have every use and remedy that is consistent with the servitude or easement of a way over it and with the police regulations."—3 Kent's Com. 433; 3 Dillon on Munic. Corp. (5th Ed.) p. 1772, § 1123, and notes.

Of course the uses to which an abutter may lawfully put a street varies with the size of the municipality in which the street is situated. An abutter upon a street in a small village may lawfully use the street for purposes which would be unlawful in a city. The dominant right in a street is the right of the public, but the extent of that right depends upon the needs of the public. The *surface* of the street, in all places, great and small, must be kept open for the lawful use of the public, unless, indeed, there is some temporary paramount need of the abutting owner for a part of it.—*Costello v. State,* 108 Ala. 45, 18 South. 820, 35 L. R. A. 303.

Of course if a village grows into a town and the town grows into a city, each step in the growth of such municipality *increases* the public demands and thus, in fact, broadens the right of the public in both the sur-

face and the subsurface use of the streets, and the authority of the abutter to use either the surface or the subsurface portions of such streets diminishes as the rights of the public increase. The private use of the abutter to the subsurface (as to the surface) of a street can only be justified out of respect to his private reasonable need therefor, subject, of course, to reasonable police regulations, and any private use to which he may put his street, as an abutter, must be held to be subservient to, and in recognition of, the dominant rights of the public in such street for all street purposes and must give way to that dominant right whenever the public needs require that it shall do so.—*Webb v. City of Demopolis,* 95 Ala. 116, 13 South. 289, 21 L. R. A. 62.

2. The facts of this case are as follows: The N. E. ¼ of section 19, township 16, range 18, Montgomery county, Ala., bounds the city of Montgomery on the southeast. The lands embraced in the above description are gently rolling and peculiarly adapted to residence purposes. On the 20th day of April, 1894, McClellan, Sherrer, and Brown, who then owned the lands and who desired to exploit and sell them for residence purposes, had the said lands surveyed and platted into lots and streets. The map of the lands, showing the various subdivisions and streets, was signed, certified acknowledged, and recorded as provided in said section 6029 of the Code. Between April 20, 1894, and June 10, 1901, the said McClellan, Sherrer, and Brown sold to sundry people a large number of said lots. On June 10, 1901, McClellan, Sherrer, and Brown and all of their vendees, under the provisions of section 6031 of the Code of 1907, annulled the above-mentioned map. The property was then resurveyed, new streets and alleys were dedicated to the use of the public instead of the old ones, a new map of the property was made, all in accord-

ance with the provisions of article 2 of chapter 142 of the Code of 1907 (sections 6028 to 6034, inclusive, of said Code), and the map was duly filed for record and recorded in the probate office of Montgomery county. From the 10th day of June, 1901, to the 20th day of April, 1908, the Cloverdale Company, a private corporation which had become the owner of much of the above-described land, sold many of the lots to sundry individuals. On April 20, 1908, the appellant, the Cloverdale Homes, was incorporated. This corporation is a private corporation and is authorized by its charter to purchase, own, sell, and otherwise deal in real estate. On or about the above-mentioned date the Cloverdale Homes, appellant here, bought from the above-mentioned Cloverdale Company 128 of said lots. The Cloverdale Homes was really organized for the purpose of buying the above lots, to improve the property and sell the lots to such persons as might desire suburban homes contiguous to the city of Montgomery. It paid $50,000 for the lots; and, in order that the situation may be made fully to appear, we copy the following from the bill of complaint, which, as we understand this case, states the truth: "Said property was then mostly unimproved; the streets having only been laid out, but not opened and put in condition for use by the public. This property lay along the streets now known as Cloverdale road, Felder street, Galena avenue, Thorn place, Earl avenue, and Prairie avenue. In order to make said lots salable, it was necessary for the complainant to open up, grade, and gravel the streets running through said property and to put water and gas mains upon said streets, so that water and gas should be accessible to the residents and owners of said lots. Complainant expended in the opening and improvement of said streets $9,048.79; in the laying of water pipes,

including fire plugs, $6,495.29; and in the laying of gas mains, $4,554.83. In order to reach the gas mains of the Montgomery Light & Water Power Company, which was the only concern furnishing gas to the inhabitants of the city of Montgomery and vicinity, it was necessary to lay mains from Norman Bridge road up to the limits of complainant's property, and this part of said main ran through no property belonging to complainant and covered a great distance. Including the part of the main just referred to and the mains laid on the streets above mentioned, complainant laid 7,961 feet of gas main, at a cost, as aforesaid, of $4,554.83. In order to get permission to connect with the gas mains of the Montgomery Light & Water Power Company, complainant had to enter into a contract with said company, a true copy of which is hereto attached, marked Exhibit · A, and prayed to·be taken as a part of this bill of complaint."

The Cloverdale Homes has, under its charter, no authority to do a public service business, but it has the authority to provide facilities for obtaining gas, lights and water for its tenants and vendees. This provision in its charter did not confer upon it the power of eminent domain nor did it confer upon it the right to use the public highways of the county of Montgomery for the purpose of laying water and gas mains in them for the purpose of conducting water and gas to its properties or the properties of its vendees. It was by virtue of the above authority to provide facilities for obtaining gas, lights, and water for the above-stated purposes that it made the contract of which Exhibit A to the bill is a copy and which the reporter will set out in his report of the facts of this case.

At the time the Cloverdale Homes laid the water and gas pipes referred to in the above-quoted portion of the

bill of complaint, Cloverdale was an unincorporated village. Before the pipes were laid, the board of revenue of Montgomery county consented thereto, and, so far as this record discloses, the pipes were laid just as they now are without the objection of any person whatsoever. The Cloverdale Homes has nothing to do with furnishing gas to its tenants or vendees. That is a matter of contract between the tenant or vendee and the Montgomery Light & Water Power Company, which is a public service corporation and which possesses the power of eminent domain. The pipes were laid by the Cloverdale Homes for the purpose of improving its own property and making it more valuable and salable, and, in selling its lots, the Cloverdale Homes has guaranteed to its vendees that they and those acquiring title through them shall have the right to tap *the gas pipe free of charge.* In order that other property owners, not the vendees of the Cloverdale Homes nor tracing title through said Cloverdale Homes, may enjoy the right of also tapping said gas pipe, the Cloverdale Homes offers all lot owners whose lots abut the streets in which the gas pipe is laid the privilege of paying a certain fixed price for that privilege. This *fixed price,* so the Cloverdale Homes contend, represents the actual cost per foot of laying the pipe along the street, but the respondent, the town of Cloverdale, contends that this fixed price is fixed arbitrarily and is greatly in excess of such cost.

The Cloverdale Homes, since acquiring the above-mentioned properties, has sold off all of its lots except 46 of them, and most of the purchasers of such lots have connected their lots with the above-mentioned gas pipe by laying service pipes from their residences under the ground to such gas pipe or main.

We direct attention to the fact that *all* of the above improvements were made, and all of the above things were done, without *objection* on the part of any one, and with the *consent* of the board of revenue of Montgomery county, while Cloverdale was an *unincorporated village* or *community*. The gas pipe or main is laid beneath the surface of the streets or driveways in which it is situated; its presence in such streets or driveways in *no* way interferes with the full and free use by the public of such streets or driveways; and the fact that it is in the streets or driveways at all would be unknown by one who had not seen it while it was being laid unless he was told of its presence. It is a convenient and cheap method used by those who are connected with it of conveying fuel to their homes and is, of course, a thing of value to those who have the legal right to use it. The village of Cloverdale, as it now exists, is simply a place of *residences*. It was not designed or intended to be other than a place of homes, and there is no remote probability that in the future it will be other than a place where people will make their homes. Its inhabitants have taken up their habitations there in order that they may be, while in their homes, free from the the dust, noise, and turmoil of city life. The adjoining city of Montgomery is the place where the people of Cloverdale now transact and will in the future transact their business affairs.

There is not now, and never has been, any objection on the part of the village of Cloverdale to the use by its inhabitants or any of them of the *water* pipe or main which was laid by the Cloverdale Homes along the streets. Water, through this water main, is supplied by the city of Montgomery to the inhabitants of Cloverdale who have *possessed* themselves of the right to use the water main, just as gas is furnished by the Mont-

gomery Light & Water Power Company to those inhabitants of Cloverdale who have possessed themselves of the right to use the gas main. While water is in *all* climates necessary to *all* human life, savage and civilized, in our climate *fuel* is an essential to *all* civilized life. In our climate every civilized home must possess the fuel necessary to provide that home with heat sufficient to meet the requirements of the kitchen and the demands of its occupants for the comforts which only heat can supply. The method provided by the Cloverdale Homes for supplying its properties, and the properties of its vendees and all others who may pay for that right, with heat is not only economical but is a method which probably puts the streets of Cloverdale as a matter of fact to less servitude and the inhabitants of Cloverdale to less inconvenience than any other known method. Heavy loads of coal and wood, when hauled about upon the highways, are more likely to produce injury to such highways than a flow of gas through a gas main firmly and properly embedded in the street and at a proper distance under the surface of such street.

3. On July 2, 1910, Cloverdale was incorporated as a municipal corporation, under the general laws of the state, under the name of the "town of Cloverdale." Since that time it has enjoyed all the privileges and rights of a municipal corporation and it has a mayor and a board of aldermen. After the "town of Cloverdale" became a municipality, the said Cloverdale Homes sold one of its said lots to one Patterson, with its usual covenant or guaranty that he and his grantees should have and possess the right, by virtue of the possession and ownership of the lot, to tap the above-mentioned gas main for the purpose of obtaining gas to be used in the residence to be erected on said lot. Patterson built for a young married daughter, Mrs. Ben Noble, a residence

on the lot, and she and her husband, Ben Noble, have taken up their residence upon the said lot. The gas main of the Cloverdale Homes is situated a few feet from this residence in the middle of a street or driveway which passes the residence on the western side of it. Ben Noble desires to tap said gas pipe. The town of Cloverdale refuses to allow him to do so, although Ben Noble is willing and in every way has offered to comply with the terms of an ordinance of said town which is set out in full in the answer of the town, and which ordinance appears on pages 30 and 31 of the transcript, and which ordinance the reporter will set out. The reasons why the town of Cloverdale has refused to allow Ben Noble, who stands in the shoes of, and acts for, Patterson, to tap the gas main are stated by the town in its answer as follows: "That said complainant laid said gas mains in the streets of said town before it was incorporated without having acquired a franchise for the purpose, and now since said town was incorporated did refuse to apply to, or accept from, said town a franchise to maintain and operate its gas mains in the streets of said town, all of which are well known to the complainant before the bill was filed. Said gas pipes as alleged were laid before the town was incorporated, and, after the incorporation of said town and up to the time of complainant's filing this bill, the town of Cloverdale has been endeavoring to make some satisfactory arrangement with complainant and with the Montgomery Light & Water Power Company by which both or one of them shall obtain a franchise from said town to engage in the gas business so that some arrangements could be made by which all residents of Cloverdale and any and all of the persons owning lots in said town could tap said gas mains and have the benefit of gas service, but neither said complainant nor the Montgom-

ery Light & Water Power Company will make any arrangements whatever with said town for the purpose of accomplishing the desire, and for that reason this defendant, acting through its mayor, has refused to grant any permit to any person to tap any gas main in the town of Cloverdale until some person, firm, or corporation, having the authority to do a gas business, shall obtain a franchise from the town of Cloverdale to engage in such business therein."

Under its charter the complainant, as we have already stated, has no *right to do a public service business.* It has the right, under the express terms of its charter, *"to supply water, gas, electric lights and power and sewerage to the purchasers or tenants of its lands, and for such purposes to make any contract or* engage in any business or enterprise which may seem desirable."

Complainant, under the letter of the above authority contained in its charter, laid the water and gas pipes at large expense and made its contract with the Montgomery Light & Water Power Company and up to the time of this controversy with Ben Noble was peaceably carrying out its contracts with the purchasers of its lots. Many of the purchasers of its lots are now in the full enjoyment of the privileges which the town of Cloverdale wishes to deny to Ben Noble because the municipality is unable to force complainant to make a contract, the *terms of which it shall itself declare,* whereby all of the inhabitants of Cloverdale shall have the right to connect with said gas pipe. The right of complainant "to supply water and gas to the purchasers or tenants of its lands" through the water and gas pipes which, at much expense, it had laid in the streets and highways of Cloverdale with the consent of the board of revenue of Montgomery county was a right which had vested in complainant before the municipality of

the town of Cloverdale was formed, and we find nothing in any of the law books indicating that the town of Cloverdale, which appears to have made no arrangement of its own, either by contract with a public service corporation or otherwise, to supply its inhabitants with either water or gas, has the right to arbitrarily deny to compalinant and its vendees the orderly exercise of these rights under such reasonable police regulations as it may see proper to prescribe. When the Cloverdale Homes laid the water and gas pipes, it did so with the consent of the board of revenue of Montgomery county and without objection on the part of any landowner whose lands abutted on any of the streets under which the pipes were laid. While the board of revenue may not have possessed the authority to grant the privilege which it thus attempted to confer, it is claimed by no one that the act of complainant in laying its pipes along the highways, pursuant to that authority, was an act in bad faith, and it cannot be claimed that the property in the water and gas pipes does not still remain in the Cloverdale Homes. Respectable courts of last resort differ on the question as to whether pipes laid as indicated in this record are an additional burden upon a rural highway.—1 Elliott on Roads & Streets (3d Ed.) p. 544, § 492; *Baltimore County Water & Electric Company v. Dubreuil*, 105 Md. 424, 66 Atl. 439, 9 L. R. A. (N. S.) 684; *Cheney v. Barker*, 198 Mass. 356, 84 N. E. 492, 16 L. R. A. (N. S.) 436. Whether they are an additional burden upon the streets or not, the complainant has, without intentional wrong, at large expense placed in the streets its pipe. The *pipe* is *there* embedded in the street, doing *damage to no one and of no injury* to the public use of the street *in any* way. It is of value to Ben Noble so long as it remains where it is, for through it he can obtain fuel for his house. Other

people possessing no more right than Ben Noble, without objection on the part of the appellees, are using this pipe for the same purpose that Ben Noble desires to use it. The doctrine of 'sic utere tuo ut alienum non lædas" is a doctrine of wide application, and we can see no reason why the town of Cloverdale, which now has complete jurisdiction over its streets, should be permitted to deny to Ben Noble the use of the pipe simply because all the other citizens of Cloverdale cannot use the pipe upon the same terms as Ben Noble. The law is reasonable, and it should not permit a municipality to deny to one of its citizens the enjoyment of a privilege of which he may be able to avail himself because all of its citizens are not so situated as to avail themselves of the same privilege.

Ben Noble, or his father-in-law, Patterson, owns the fee of his lot to the center of the street, and, as the excavation which he desires to make in the street is safely guarded by the ordinance of the town of Cloverdale and can amount to inconvenience to no one, we can see no reason why he should not be permitted to make it. —*Wright v. City of Mt. Vernon,* 44 App. Div. 574, 60 N. Y. Supp. 1017.

4. Undoubtedly the town of Cloverdale has complete jurisdiction over its streets, and it has power, if that be necessary to secure gas for all of its residents of the same class upon equal terms, to require the appellant to remove its gas pipes from its streets or, upon the payment to appellant of a sum which will justly compensate it for the value of its pipes, to condemn the pipes to the use of the town. It cannot be said that the pipe can be maintained by appellant in the streets of Cloverdale as a matter of right, and we think that, taking into consideration the character of the pipe and its

evident sufficiency to meet the demands of the owners of land who abut upon the streets in which it is laid, a court of equity, upon a bill filed for that purpose, can compel the Cloverdale Homes to accept what the court may determine to be just compensation to it for the re-use of its pipe for the stated purpose, or to remove the pipe from the streets.

The Montgomery Light & Water Power Company is a public service corporation and it cannot, of course, furnish to one of the residents of Cloverdale gas for his residence and not furnish gas to all other residents of the town *occupying the same class* for their residences. All persons of the same class are entitled to gas upon the same terms.—*City of Montgomery v. R. H. Greene,* 180 Ala. 322, 60 South. 900. It is, of course, within the power of the town of Cloverdale, by such reasonable ordinances as it may see proper to adopt to require a franchise tax of the Montgomery Light & Water Power Company for the privilege of supplying the inhabitants of the town of Cloverdale with gas, but, *so long* as said town *permits* the said company to supply *any* of the inhabitants of Cloverdale with gas through said gas main, it has *not* the authority to deny to Ben Noble the right to use said gas pipe for said purpose.

It is our opinion, therefore, that the appellant is entitled to the relief prayed for in its bill of complaint, and that the town of Cloverdale, upon the tender by Ben Noble of the sum of $10 as required by the ordinance which we have ordered the reporter to set out in his report of the facts of this case, be enjoined from preventing the said Ben Noble from making an excavation in the street necessary to enable him to attach a service pipe to the said gas pipe at a point opposite his residence in said street.

[Roycroft, et al. v. Jordan, et al.]

The decree of the chancellor is therefore reversed, and and a decree is here rendered granting the complainant the relief prayed for in its bill of complaint.

Reversed and rendered.

DOWDELL, C. J., and ANDERSON and MAYFIELD, JJ., concur.