# In re Harrisburg Bridge Company

94

*Hause, Evans, Storey & Lick,* and *E. M. Biddle, Jr.,* for petitioner.

*Charles J. Margiotti,* Attorney General, *John D. Faller,* Special Deputy Attorney General, and *Forrest Mercer,* for Commonwealth.

REESE, P. J., July 7, 1936.—Upon the petition of the Secretary of Highways and under the provisions of the Act of April 27, 1927, P. L. 395, as amended by the Act of January 2, 1934, P. L. 205, this court, on February 28, 1936, appointed three viewers to view and ascertain the value of the "Market Street" toll bridge which the Commonwealth has determined to acquire under its power of eminent domain. The bridge, owned by the Harrisburg Bridge Company, a Pennsylvania corporation, spans the Susquehanna River between the City of Harrisburg, in

the County of Dauphin, and East Pennsboro Township, in the County of Cumberland.

On March 17, 1936, the Harrisburg Bridge Company filed its petition for a rule to vacate the appointment of the viewers. A rule was granted, and on April 1, 1936, the Commonwealth filed its answer. Thereafter, on the petition and answer and without depositions or testimony, the matter was set down for argument by the Commonwealth.

It is highly important that we constantly remember that the sole question now before the court is whether the viewers should be permitted to proceed with their duties or whether their appointment should be vacated. The first reason assigned by the bridge company for vacating the appointment is that the property sought to be condemned consists of two bridges, the approaches thereto and a tract of land connecting the bridges located upon an island; that only the bridge spanning the western channel is "on the boundary line between two or more counties," as provided in the Act of 1927, supra; that the other bridge and real property is located wholly within Dauphin County and is not within the jurisdiction of this court. It is contended that these facts are admitted by the Commonwealth in setting the matter down for argument upon the petition and answer. But the petition also avers that the bridge company is a corporation "authorized to construct, own and operate a toll bridge" and it is a matter of common knowledge that all of the property of the bridge company is operated as a unit as one toll bridge. True, the toll bridge may consist of two spans connected by an island tract, but the Commonwealth is seeking to acquire in its entirety all of the property which is used as one toll bridge, and, admittedly, taken as an entirety, the property used as a toll bridge lies on the boundary between Dauphin and Cumberland Counties. Further, under the definition in the Act of 1927, supra, a toll bridge includes all of the real and personal property, approaches, etc., belonging to the owners of such bridge, "and used in the operation and maintenance of the same."

The Commonwealth's petition for the appointment of viewers avers that the Commonwealth desires to acquire the actual bridge, "the terminal approaches," "the intermediate approaches" where the bridge crosses the island, "and all real and personal property as well as all other property contemplated to be taken by said Act of 1927 and its amendment and which belongs to the owner of such bridge and is used in the operation and maintenance of same". The petition then describes in detail the physical bridge, approaches, easements, and real property and concludes the description as follows:

"The same being, and it is intended to include, the actual bridge, the approaches thereto, and all real property and other property rights, belonging to the owner of the bridge, and used in the operation and maintenance of the same. Together with such personal property belonging to the owners as is used in the operation and maintenance of the bridge."

Section 1 of the Act of 1927, as amended, provides: "that the word 'bridge,' as used in this act, shall mean any bridge whereon toll is charged over any stream or river, or over a stream or river and the facilities of any public service company, and shall include the actual bridge, the approaches thereto, and all real and personal property, including the franchise, belonging to the owner or owners of such bridge and used in the operation and maintenance of the same."

The bridge company contends that the petition is defective because it does not specifically appear therein that the Commonwealth desires to acquire the franchise, that the petition does not pray for the appointment of viewers to value the franchise, and that the court cannot appoint viewers to determine the value of the property described in the petition because the franchise is not included. But we think the franchise is included. The petition undoubtedly reveals an intention to acquire by condemnation a toll bridge in accordance with the Act of 1927 and its amendment and as defined therein. The peti-

tion, as already pointed out, avers a desire to acquire "all other property contemplated to be taken by said Act of 1927 and its amendment and which belongs to the owner of such bridge and is used in the operation and maintenance of same". Then, at the conclusion of the detailed description, appears: "together with such personal property belonging to the owners as is used in the operation and maintenance of the bridge." Either or both of these averments, as well as the whole petition, reveal an intent to acquire, inter alia, the franchise. We conclude that the petition prays for the appointment of viewers to ascertain the value of the bridge, including the franchise, as defined in the Act of 1927. If the viewers, in their valuation, omit the franchise, the matter can be recommitted to them.

Section 3 of the Act of 1927 provides:

"The Secretary of Highways shall, whenever he determines to acquire any such bridge, ascertain or estimate the value thereof, and shall, in writing, give notice of such valuation to the owner or owners thereof. Such notice shall contain an offer to purchase such bridge at the valuation made by the Secretary of Highways."

Section 4 provides for the appointment of viewers "in the event that the owner or owners of any such bridge refuse or neglect to accept such offer".

On September 30, 1935, the Secretary of Highways gave written notice to the bridge company as follows:

"In accordance with the provisions of the Act of April 27, 1927, P. L. 395, as amended by the Act of Jan. 2, 1934, P. L. 205, I have caused to be estimated the value of the Market Street Bridge, and you are hereby notified that such valuation is the sum of one million five hundred one thousand dollars,· ($1,501,000).

"Pursuant to said Act, I hereby offer to purchase said Market Street Bridge from your company for said sum of one million five hundred one thousand dollars, ($1,501,000), said offer to include such rights, licenses, lands, toll houses, and other appurtenances at the site of such bridge, which the Company owns, has and uses in connec-

tion with the location, maintenance and operation of said bridge and necessary thereto. . . ."

It is argued by the bridge company that the foregoing notice and offer to purchase does not include any notice that the Commonwealth intends to appropriate the franchise or that it has been included in the valuation as estimated, and that, hence, the offer contemplated by the act as a condition precedent to the appointment of viewers has not been made. Of course, under the definition of "bridge" in section 1, supra, franchise is included, and the franchise must be included in the valuation and offer to purchase. We think it has been. The valuation, so states the notice, was estimated in accordance with the Act of 1927, the offer was made pursuant to the act, and includes the rights and licenses of the company owned or used in the operation of the bridge. Certainly such "rights and licenses" include the franchise, and certainly, if the valuation of the bridge was estimated "in accordance with the Act" and the offer to purchase the bridge was "pursuant to the Act", there could only be meant the valuation of and offer to purchase a bridge, as that term is meant in the act, and section 1 of the act says that the term "bridge" includes the franchise. We can only infer that the bridge company itself construed the valuation and offer as including the franchise, for its rejection of the offer was based, not upon the failure to include the franchise, but upon the inadequacy of the price.

Section 16 was adopted at the election of 1933 as an amendment to article IX of the Constitution of Pennsylvania. It provides that "the General Assembly may provide by law for the issue of bonds, to the amount of ten millions of dollars, for the purpose of acquiring toll bridges, and may, by law, provide that, upon the acquisition of any such bridge, tolls may be charged for the use thereof, sufficient to pay the interest and sinking fund charges on such bonds and the cost of maintenance of such bridges, until the bonds issued have been retired and such bridges are freed of tolls."

Paragraph 11 of the bridge company's petition to vacate the appointment of viewers avers that "the bonds issued under this constitutional provision, or the proceeds of such bonds, cannot be used for the payment of compensation for damages due to the condemnation of your petitioner's property, but only for the purpose of the acquisition of that property by the Commonwealth." We take this to mean that the bonds or proceeds thereof cannot be used to pay for bridges acquired by eminent domain, but can only be used to pay for bridges acquired by purchase. We cannot agree. The constitutional amendment of 1933 places no limitation upon the Commonwealth's sovereign and inherent power of eminent domain, nor upon the manner in which toll bridges may be acquired, but merely authorizes the borrowing of money to pay for them if and when acquired, and the legislature, under its undoubted constitutional power, has provided in section 2 of the Act of 1927 and its amendment that "the acquisition of said toll bridges may be either by purchase or by condemnation proceedings, as the Secretary of Highways may deem expedient."

The Act of 1927, as amended by the Act of 1934, provides that, when a toll bridge has been acquired by the Secretary of Highways, he shall continue to collect tolls and charges on such bridge or bridges until the Commonwealth has been reimbursed to the full extent of the original cost of acquiring any and all of such bridges, with interest, and that, when the tolls from all of such bridges shall have become sufficient to reimburse the Commonwealth in full for the cost of acquiring all of such bridges with interest, all such bridges shall become free.

It is argued that this scheme violates the constitutional amendment of 1933 for the reason that the people, in that amendment, authorized the continued collection of tolls on a particular bridge until the Commonwealth was reimbursed for the cost of that particular bridge. In the first place, the constitutional amendment is capable of a con-

struction that authorizes the scheme provided in the Act of 1934. The amendment provides that when a bridge is acquired tolls may be collected for the use thereof sufficient to pay principal and interest of "such bonds", referring to the authorized issue of $10,000,000, "until the bonds [id.]issued have been retired and such bridges [note use of plural] are freed of tolls." It is the duty of courts to seek a construction which will support the legislative interpretation of the Constitution, and an act can never properly be held violative of the Constitution unless this is found to be impossible: Commonwealth v. Snyder, 279 Pa. 234, 239.

Furthermore, we fail to see how the alleged impropriety of continued collection of tolls by the Commonwealth until all bridges taken under the Act of 1927 are paid for, can in any way adversely affect the bridge company. If the instant bridge is ultimately taken by the Commonwealth, means of compensation has been provided; the constitutional amendment authorizes the legislature to issue bonds for that purpose, the Act of January 2, 1934, P. L. 201, authorizes the issue and sale of bonds and creates the toll bridge fund into which the proceeds of bonds shall be paid and used to pay the cost of acquiring toll bridges, and the Act of 1927, and its amendment of January 2, 1934, P. L. 205, specifically appropriate the moneys in the toll bridge fund for that purpose. If just compensation is paid or secured to the bridge company before its bridge is taken, it cannot be interested in or affected by the means which the Commonwealth adopts to reimburse itself. We cannot see how any impropriety in a reimbursement scheme can render improper or unconstitutional the issue of bonds for the payment of the bridges. One who is not affected or injured by an act of assembly cannot question its constitutionality: Pennsylvania R. R. Co. et al. v. Public Service Commission et al., 118 Pa. Superior Ct. 380.

But it is contended that the Act of 1927 and its amendment violate the Federal and State Constitutions in au-

thorizing the condemnation of a toll bridge and the continued collection of tolls until all bridges taken are paid for, because such a taking would involve devoting the bridge to the same use or purpose to which it is now devoted by the bridge company, namely, making money. It is urged that the taking of the bridge for such a purpose is not a taking for a higher use or a public use. The bridge company strongly relies on West River Bridge Co. v. Dix, 6 How. (47 U. S.) 507. The Supreme Court of the United States upheld the right of a State to condemn a toll bridge and make it free of tolls, but said, obiter dictum, at page 537:

"No State could resume a charter under the power of appropriation, and carry on the functions of the corporation. A bank charter could not be thus taken, and the business of the bank continued for public purposes. Nor could this bridge have been taken by the State, and kept up by it, as a toll-bridge. This could not be called an appropriation of private property to public purposes. There would be no change in the use, except the application of the profits, and this would not bring the act within the power. . . . The use of this bridge, it is contended, is the same as before the act of appropriation. . . . But it was a toll-bridge, and by the act it is made free. The use, therefore, is not the same."

While we admit the property of a private corporation devoted to a public use cannot be taken to be used in the same manner for the same purpose by a different corporation or, as stated in many cases "the State cannot take property from A to convey it to B": Nichols on Eminent Domain (2d. ed.), 974-978 and cases cited; yet it is well settled that the legislature may authorize the taking by the State or a municipality of property of a private corporation devoted to a public use and the continuance of the same undertaking by the State or municipality for its own profit. The distinction made by the dictum in West River Bridge Co. v. Dix, supra, was not followed, when the point was directly raised in Long Island Water Sup-

ply Co. v. Brooklyn, 166 U. S. 685. In that case the condemnation of the franchise and property of a water supply company by a municipality was sustained, although it was intended to continue to charge for the use of the water. The court said, at page 694:

"Neither can the power of the State to condemn a water works system depend upon the question whether it makes the supply of water absolutely free to all individuals who desire to use it. The State, which, in the first place, has the power to construct a water supply system and charge individuals for the use of the water, may condemn a system already constructed, and continue to make such charge. This is not turning property from one private corporation to another, but taking property from a private corporation and vesting the title in some municipal corporation for the public use. It is not essential to a public use that it be absolutely free and without charge to any one."

Accordingly, it has been consistently held that the property of a private corporation devoted to a public use may be taken by a municipal corporation to be used for the same purpose in the same manner, for it may enure to the public good that a public enterprise be managed by the public itself rather than by a private corporation: Nichols on Eminent Domain (2d. ed.) 979; Cloverdale Homes v. Cloverdale, 182 Ala. 419; Opinion of the Justices, 66 N. H. 629; Brady v. Atlantic City, 53 N. J. Eq. 440; Plainfield-Union Water Co. v. Plainfield, 83 N. J. L. 332; In re Brooklyn, 143 N. Y. 596; Tacoma v. Nisqually Power Co., 57 Wash. 420.

Our own Supreme Court has held that a toll bridge can be taken by eminent domain and made a free bridge: In re Towanda Bridge Co., 91 Pa. 216. If taking a toll bridge to make it free involves a public use and is a proper exercise of the power of eminent domain, we cannot see that it matters whether it is to be made free immediately upon the taking, or ultimately, when the same bridge or all similar bridges have been paid for out of continued tolls.

As we have already seen the public use is not destroyed or prevented by continued charging of tolls by the State, and, if the ultimate purpose is to make the present bridge and other toll bridges free, we can find no violation of the Federal or State Constitutions nor any improper exercise of the power of eminent domain.

It is also contended that the Act of 1927 and its amendment violates article III, sec. 3, of the Constitution of Pennsylvania, because the title of the act does not clearly give notice that it confers upon the Commonwealth the right to condemn a toll bridge. The title of the Act of 1927 is:

"An act empowering the Department of Highways to acquire certain toll bridges within the Commonwealth; providing the procedure therefor; providing for the reimbursement of the Commonwealth from tolls and charges; and making an appropriation."

It is contended that under this title there is given notice that the act confers upon the Commonwealth the right to purchase but gives no notice that it gives the right to condemn.

"The title to an act need name only the real subject of the legislation, and . . . it need not index all the subdivisions thereof, nor any matters that may be fairly related to it": Retirement Board v. McGovern et al., 316 Pa. 161, 165; "an act will not be declared unconstitutional as offending section 3, of article III, 'unless a substantive matter, entirely disconnected with the named legislation, is included within the folds of the bill' ": Soldiers and Sailors Memorial Bridge, 308 Pa. 487, 490.

" 'If the title fairly gives notice of the subject of the act, so as reasonably to lead to an inquiry into the body of the same, it is all that is necessary' ": Commonwealth ex rel. v. Miller, 313 Pa. 140, 143.

All presumptions are in favor of the constitutionality of the act: Commonwealth v. Snyder, 279 Pa. 234, 239; "courts are not to be astute in finding or sustaining objections": Sugar Notch Borough, 192 Pa. 349.

In view of these principles, and that Webster defines the meaning of "acquire" as "to gain by any means", we feel that the title, "empowering the Department of Highways to acquire certain toll bridges . . . providing the procedure therefor", fairly gives notice that the Act of 1927, in section 2, provides, inter alia: "The acquisition of said toll bridges may be either by purchase or by condemnation proceedings".

Another objection interposed by the bridge company is that its bridge is an instrumentality of the Federal Government and hence cannot be taken by the State under its power of eminent domain. This argument is based on the Act of Congress of March 23, 1906, 34 Stat. 84, 33 U. S. C. §491, a general act providing for the construction of bridges over navigable streams, and providing that, whenever Congress grants authority to construct and maintain a bridge over a navigable stream, the plans therefor must be submitted for the approval of the Secretary of War and Chief of Engineers; that upon such a bridge no higher charge shall be made for transmission over the same of the mails, the troops, and the munitions of war of the United States than the rate per mile paid over any railway, street railway, or public highway leading to said bridge; and, further, that the Secretary of War may at any time, and from time to time, prescribe the reasonable rates of toll for such transit of such bridge. By the Act of Congress of February 7, 1925, 43 Stat. 814, Congress granted its consent to the Harrisburg Bridge Company and its successors and assigns to construct or reconstruct, maintain, and operate the bridge in question in accordance with the Act of 1906, supra. These acts do not make the bridge an instrumentality of the Federal Government which is beyond the reach of the State's power of eminent domain. The consent of Congress to construct, maintain, and operate the bridge is given to the bridge company, its successors and assigns. The Commonwealth desires to become the "successor" of the bridge company, and, if and when it succeeds, we see no reason

why it cannot maintain and operate the bridge subject to the same limitations which are now imposed upon the bridge company by the Act of 1906, supra.

As already stated, the Act of January 2, 1934, P. L. 201, provides for the issuance of bonds to the amount of $10,000,000, pursuant to article IX, sec. 16, of the Constitution. Section 4 of the act provides:

"The proceeds realized from the sale of bonds under the provisions of this act shall be paid into the State Treasury and deposited in a special fund, to be known as the Toll Bridge Fund, which is hereby created, and shall be used for the payment of the cost of acquiring toll bridges and any necessary expenses connected therewith."

Section 1 of the Act of January 2, 1934, P. L. 205, amending section 9 of the Act of 1927, provides:

"The purchase price agreed upon for any such bridge, or the amount of any award or verdict under condemnation proceeding for the acquisition of any such bridge, shall be paid out of moneys in the Toll Bridge Fund by the State Treasurer upon requisition of the Secretary of Highways."

The bridge company points out, and the Commonwealth admits, that no bonds have been issued and there is no money in the toll bridge fund. Hence it is argued that there is no security to the bridge company for compensation and that the appointment of viewers violates article I, sec. 10, of the Constitution, which provides, "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." It is contended that there is no security for just compensation until there is sufficient money in the toll bridge fund to pay for the bridge in question.

In a case before the Common Pleas of Dauphin County, sitting in equity, Harrisburg Bridge Co. v. Van Dyke, 42 Dauph. 213, it appears that on January 21, 1936, the defendant, as Secretary of Highways, undertook to take

possession of the bridge involved in the proceeding now before us. The Dauphin County court, in an opinion by Hargest, P. J., continued a preliminary injunction restraining the defendant from taking possession of the bridge on the ground that, because there was no money in the toll bridge fund, there was no security for just compensation as guaranteed by article I, sec. 10, of the Constitution, supra, and also on the ground that the taking was improper, there being no money in the toll bridge fund, under the provisions of section 9 as amended by the Act of 1934, P. L. 205, which provides:

"As soon as the Secretary of Highways and said owners shall have agreed upon the price of any such bridge, or as soon as the Secretary of Highways shall have determined to acquire any such bridge by condemnation proceedings, the Secretary of Highways, if funds sufficient for the purchase of the bridge are available in the Toll Bridge Fund, shall at once take possession of such bridge in the name of the Commonwealth of Pennsylvania."

Undoubtedly this section was enacted to comply with the constitutional provision, article I, sec. 10, supra, prohibiting a taking of property under eminent domain "without just compensation being first made or secured".

But it must be carefully noted that under both the constitutional and statutory provisions just referred to the necessity of security for compensation is a condition precedent to the taking of property for a public use. We can find no constitutional or statutory provision nor any court decision which requires that there be security for compensation before instituting condemnation proceedings by the appointment of viewers or otherwise for the purpose of ascertaining the value of the property to be taken. Certainly no security would first have to be effected to enable the Secretary of Highways to determine the value of the bridge by amicable negotiations looking toward a purchase. We see no reason for effecting security before taking steps to ascertain value adversely

by condemnation proceedings. In either event, there will be compliance with the Constitution and the statute if security is effected by placing sufficient money in the toll bridge fund before the actual taking of the bridge. In the meantime, the Secretary of Highways should be in a position to ascertain the value of the bridge and thus know what moneys should go into the toll bridge fund in order to put himself into a proper position to take possession legally and constitutionally. It may be that, after ascertaining the value in the present proceeding, the Commonwealth may decide that the project is too expensive or inexpedient and abandon the whole idea, as was done in Reinbold v. Commonwealth, 319 Pa. 33.

It is worthy of note that in the case last cited condemnation proceedings were instituted and prosecuted, although the Commonwealth could not and did not take actual possession. The act there applicable provided for the right to take possession after the filing of the report of viewers. In the instant case, therefore, we see no reason for denying the right to prosecute the present proceeding although the Commonwealth cannot take possession until it effects security for compensation by placing sufficient moneys in the toll bridge fund. It is also interesting to note that the same case recognizes that the Commonwealth should have the same right as any prudent individual, the right to ascertain the price of what it proposes to acquire, and, if the price is found to be excessive or the acquisition inexpedient, to accept or reject within a reasonable time. Hence we conclude that the present lack of security for compensation, although a bar to taking possession of the bridge does not prevent the prosecution of the present proceedings to ascertain the value.

Finally, it is contended that the continuance of the present proceeding casts a cloud upon the title of the bridge company and that no one would purchase the property of the company at a reasonable price so long as the proceeding is hanging over it. We do not doubt the sin-

cerity of the Commonwealth's avowed intent to acquire the bridge. If it does take the bridge, the law guarantees that just compensation be first paid or secured. In the meantime, even though later the Commonwealth should decide to abandon the project, the bridge has not been taken and the objection that there is a cloud on title is unsubstantial. Until the bridge is actually taken and just compensation made, the owner is entirely free to control and dispose of the property: State Water Supply Commission v. Curtis, 192 N. Y. 319, 330.

Further, to the foregoing contention and to the objection that this proceeding will involve extended and expensive litigation and subject the bridge company to burdensome expense, we reply that in the event that the Commonwealth abandons the project the court can do what was done in Reinbold v. Commonwealth, 319 Pa. 33, 46, viz., ascertain, by appropriate proceedings, the amount of costs, expenses, and damages expended and suffered by the owner by reason of the intended condemnation of its property. On the other hand, if the Commonwealth carries out its present intention, takes the bridge and pays just compensation therefor, the fears now entertained by the bridge company will not materialize.

And now, July 7, 1936, the rule granted on March 17, 1936, to vacate the appointment of viewers is hereby discharged and the viewers heretofore appointed by this court on February 28, 1936, are directed to proceed with their duties in accordance with the Act of April 27, 1927, P. L. 395, as amended by the Act of January 2, 1934, P. L. 205, and the court appoints and fixes August 4, 1936, at 10 a.m., when said viewers shall meet upon the property and view the same. The said viewers shall cause at least 10 days' personal notice of the time and place of such meeting to be given to the Attorney General and the president, secretary, or treasurer of the Harrisburg Bridge Company, if such officer resides within the County of Cumberland. If none of said officers resides within said county, or none be found therein, notice of such meeting shall be

given personally or by registered mail, to any of such officers wherever they may be found.