## MARSH *v.* ALABAMA.

No. 114. Argued December 6, 1945.—Decided January 7, 1946.

*Mr. Hayden C. Covington,* with whom *Mr. Grover C. Powell* was on the brief, for appellant.

*William M. McQueen,* Attorney General of Alabama, and *John O. Harris,* Assistant Attorney General, submitted for appellee.

MR. JUSTICE BLACK delivered the opinion of the Court.

In this case we are asked to decide whether a State, consistently with the First and Fourteenth Amendments, can impose criminal punishment on a person who undertakes to distribute religious literature on the premises of a company-owned town contrary to the wishes of the town's management. The town, a suburb of Mobile, Alabama, known as Chickasaw, is owned by the Gulf Shipbuilding Corporation. Except for that it has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a "business block" on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and

the United States uses one of the places as a post office from which six carriers deliver mail to the people of Chickasaw and the adjacent area. The town and the surrounding neighborhood, which can not be distinguished from the Gulf property by anyone not familiar with the property lines, are thickly settled, and according to all indications the residents use the business block as their regular shopping center. To do so, they now, as they have for many years, make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and leave the stores and the post office. Intersecting company-owned roads at each end of the business block lead into a four-lane public highway which runs parallel to the business block at a distance of thirty feet. There is nothing to stop highway traffic from coming onto the business block and upon arrival a traveler may make free use of the facilities available there. In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation.

Appellant, a Jehovah's Witness, came onto the sidewalk we have just described, stood near the post office and undertook to distribute religious literature. In the stores the corporation had posted a notice which read as follows: "This Is Private Property, and Without Written Permission, No Street, or House Vendor, Agent or Solicitation of Any Kind Will Be Permitted." Appellant was warned that she could not distribute the literature without a permit and told that no permit would be issued to her. She protested that the company rule could not be constitutionally applied so as to prohibit her from distributing religious writings. When she was asked to leave the sidewalk and Chickasaw she declined. The deputy sheriff arrested her and she was charged in the state court with violating Title

14, § 426 of the 1940 Alabama Code which makes it a crime to enter or remain on the premises of another after having been warned not to do so. Appellant contended that to construe the state statute as applicable to her activities would abridge her right to freedom of press and religion contrary to the First and Fourteenth Amendments to the Constitution. This contention was rejected and she was convicted. The Alabama Court of Appeals affirmed the conviction, holding that the statute as applied was constitutional because the title to the sidewalk was in the corporation and because the public use of the sidewalk had not been such as to give rise to a presumption under Alabama law of its irrevocable dedication to the public. 21 So. 2d 558. The State Supreme Court denied certiorari, 246 Ala. 539, 21 So. 2d 564, and the case is here on appeal under § 237 (a) of the Judicial Code, 28 U. S. C. § 344 (a).

Had the title to Chickasaw belonged not to a private but to a municipal corporation and had appellant been arrested for violating a municipal ordinance rather than a ruling by those appointed by the corporation to manage a company town it would have been clear that appellant's conviction must be reversed. Under our decision in *Lovell* v. *Griffin*, 303 U. S. 444 and others which have followed that case,[1] neither a State nor a municipality can completely bar the distribution of literature containing religious or political ideas on its streets, sidewalks and public places or make the right to distribute dependent on a flat license tax or permit to be issued by an official who could deny it at will. We have also held that an ordinance completely prohibiting the dissemination of ideas on the city streets cannot be justified on the ground that the

[1] *Hague* v. *C. I. O.*, 307 U. S. 496; *Schneider* v. *State*, 308 U. S. 147; *Thornhill* v. *Alabama*, 310 U. S. 88; *Cantwell* v. *Connecticut*, 310 U. S. 296; dissent of Chief Justice Stone in *Jones* v. *Opelika*, 316 U. S. 584, 600, adopted as the opinion of the Court, 319 U. S. 103; *Largent* v. *Texas*, 318 U. S. 418; *Murdock* v. *Pennsylvania*, 319 U. S. 105; *Follett* v. *McCormick*, 321 U. S. 573.

municipality holds legal title to them. *Jamison* v. *Texas*, 318 U. S. 413. And we have recognized that the preservation of a free society is so far dependent upon the right of each individual citizen to receive such literature as he himself might desire that a municipality could not, without jeopardizing that vital individual freedom, prohibit door to door distribution of literature. *Martin* v. *Struthers*, 319 U. S. 141, 146, 147. From these decisions it is clear that had the people of Chickasaw owned all the homes, and all the stores, and all the streets, and all the sidewalks, all those owners together could not have set up a municipal government with sufficient power to pass an ordinance completely barring the distribution of religious literature. Our question then narrows down to this: Can those people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town? For it is the State's contention that the mere fact that all the property interests in the town are held by a single company is enough to give that company power, enforceable by a state statute, to abridge these freedoms.

We do not agree that the corporation's property interests settle the question.[2] The State urges in effect that

---

[2] We do not question the state court's determination of the issue of "dedication." That determination means that the corporation could, if it so desired, entirely close the sidewalk and the town to the public and is decisive of all questions of state law which depend on the owner's being estopped to reclaim possession of, and the public's holding the title to, or having received an irrevocable easement in, the premises. *Demopolis* v. *Webb*, 87 Ala. 659, 6 So. 408; *Hamilton* v. *Town of Warrior*, 215 Ala. 670, 112 So. 136; *Town of Leeds* v. *Sharp*, 218 Ala. 403, 405, 118 So. 572; *Forney* v. *Calhoun County*, 84 Ala. 215, 4 So. 153; *Cloverdale Homes* v. *Cloverdale*, 182 Ala. 419, 62 So. 712. The "dedication" of a road to the public may also be decisive of whether, under Alabama law, obstructing the road constitutes a crime, *Beverly* v. *State*, 28 Ala. App. 451, 185 So. 768, and whether certain action on or near the road amounts to a tort. *Thrasher* v. *Burr*, 202 Ala. 307, 80 So. 372. But determination of the issue of "dedication" does not decide the question under the Federal Constitution here involved.

the corporation's right to control the inhabitants of Chickasaw is coextensive with the right of a homeowner to regulate the conduct of his guests. We cannot accept that contention. Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Cf. *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, 798, 802, n. 8. Thus, the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function, it is subject to state regulation.[3] And, though the issue is not directly analogous to the one before us, we do want to point out by way of illustration that such regulation may not result in an operation of these facilities, even by privately owned companies, which unconstitutionally interferes with and discriminates against interstate commerce. *Port Richmond Ferry* v. *Hudson County, supra,* 234 U. S. at 326 and cases cited, pp. 328–329; cf. *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177. Had the corporation here owned the segment of the four-lane highway which runs parallel to the "business block" and operated the same under a state franchise, doubtless no one would have seriously contended that the corporation's property interest in the highway gave it power to obstruct through traffic or to discriminate against interstate commerce. See

---

[3] *Clark's Ferry Bridge Co.* v. *Public Service Commission,* 291 U. S. 227; *American Toll Bridge Co.* v. *Railroad Commission,* 307 U. S. 486; *Mills* v. *St. Clair County,* 8 How. 569, 581; *Port Richmond Ferry* v. *Hudson County,* 234 U. S. 317, 327, 331–332; *Covington & L. Turnpike Road Co.* v. *Sandford,* 164 U. S. 578; *Norfolk & S. Turnpike Co.* v. *Virginia,* 225 U. S. 264; *Donovan* v. *Pennsylvania Co.,* 199 U. S. 279, and cases cited on pp. 293–295.

*County Commissioners* v. *Chandler*, 96 U. S. 205, 208; *Donovan* v. *Pennsylvania Co., supra*, 199 U. S. at 294; *Covington Drawbridge Co.* v. *Shepherd*, 21 How. 112, 125. And even had there been no express franchise but mere acquiescence by the State in the corporation's use of its property as a segment of the four-lane highway, operation of all the highway, including the segment owned by the corporation, would still have been performance of a public function and discrimination would certainly have been illegal.[4]

We do not think it makes any significant constitutional difference as to the relationship between the rights of the owner and those of the public that here the State, instead of permitting the corporation to operate a highway, permitted it to use its property as a town, operate a "business block" in the town and a street and sidewalk on that business block. Cf. *Barney* v. *Keokuk*, 94 U. S. 324, 340. Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free. As we

---

[4] And certainly the corporation can no more deprive people of freedom of press and religion than it can discriminate against commerce. In his dissenting opinion in *Jones* v. *Opelika*, 316 U. S. 584, 600, which later was adopted as the opinion of the Court, 319 U. S. 103, 104, Mr. Chief Justice Stone made the following pertinent statement: "Freedom of press and religion, explicitly guaranteed by the Constitution, must at least be entitled to the same freedom from burdensome taxation which it has been thought that the more general phraseology of the commerce clause has extended to interstate commerce. Whatever doubts may be entertained as to this Court's function to relieve, unaided by Congressional legislation, from burdensome taxation under the commerce clause, see *Gwin, White & Prince* v. *Henneford*, 305 U. S. 434, 441, 446–55; *McCarroll* v. *Dixie Lines*, 309 U. S. 176, 184–85, it cannot be thought that that function is wanting under the explicit guaranties of freedom of speech, press and religion." 316 U. S. at 610–11.

have heretofore stated, the town of Chickasaw does not function differently from any other town. The "business block" serves as the community shopping center and is freely accessible and open to the people in the area and those passing through. The managers appointed by the corporation cannot curtail the liberty of press and religion of these people consistently with the purposes of the Constitutional guarantees, and a state statute, as the one here involved, which enforces such action by criminally punishing those who attempt to distribute religious literature clearly violates the First and Fourteenth Amendments to the Constitution.

Many people in the United States live in company-owned towns.[5] These people, just as residents of municipalities, are free citizens of their State and country. Just as all other citizens they must make decisions which affect the welfare of community and nation. To act as good citizens they must be informed. In order to enable them to be properly informed their information must be uncensored. There is no more reason for depriving these people of the liberties guaranteed by the First and Four-

---

[5] In the bituminous coal industry alone, approximately one-half of the miners in the United States lived in company-owned houses in the period from 1922-23. The percentage varied from 9 per cent in Illinois and Indiana and 64 per cent in Kentucky, to almost 80 per cent in West Virginia. U. S. Coal Commission, Report, 1925, Part III, pp. 1467, 1469 summarized in Morris, The Plight of the Coal Miner, Philadelphia 1934, Ch. VI, p. 86. The most recent statistics we found available are in Magnusson, Housing by Employers in the United States, Bureau of Labor Statistics Bulletin No. 263 (Misc. Ser.) p. 11. See also United States Department of Labor, Wage and Hour Division, Data on Pay Roll Deductions, Union Manufacturing Company, Union Point, Georgia, June 1941; Rhyne, Some Southern Cotton Mill Workers and Their Villages, Chapel Hill, 1930 (Study completed under the direction of the Institute for Research in Social Science at the University of North Carolina); Comment, *Urban Redevelopment*, 54 Yale L. J. 116.

teenth Amendments than there is for curtailing these freedoms with respect to any other citizen.[6]

When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position.[7] As we have stated before, the right to exercise the liberties safeguarded by the First Amendment "lies at the foundation of free government by free men" and we must in all cases "weigh the circumstances and . . . appraise the . . . reasons . . . in support of the regulation . . . of the rights." *Schneider* v. *State,* 308 U. S. 147, 161. In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute. Insofar as the State has attempted to impose criminal punishment on appellant for undertaking to distribute religious literature in a company town, its action cannot stand. The case is re-

---

[6] As to the suppression of civil liberties in company towns and the need of those who live there for Constitutional protection, see the summary of facts aired before the Senate Committee on Education and Labor, *Violations of Free Speech and Rights of Labor,* Hearings pursuant to S. Res. 266, 74th Cong., 2d Sess., 1937, summarized in Bowden, *Freedom for Wage Earners,* Annals of The American Academy of Political and Social Science, Nov. 1938, p. 185; Z. Chafee, *The Inquiring Mind* (New York, 1928), pp. 173–74; Pamphlet published in 1923 by the Bituminous Operators' Special Committee under the title *The Company Town;* U. S. Coal Commission, Report, *supra,* Part III, p. 1331.

[7] *Jones* v. *Opelika, supra,* 316 U. S. at 608; *Murdock* v. *Pennsylvania, supra,* 319 U. S. at 115; *Follett* v. *McCormick, supra,* 321 U. S. at 577.

versed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

So long as the views which prevailed in *Jones* v. *Opelika,* 319 U. S. 103, in connection with 316 U. S. 584, 600; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Martin* v. *Struthers,* 319 U. S. 141, express the law of the Constitution, I am unable to find legal significance in the fact that a town in which the Constitutional freedoms of religion and speech are invoked happens to be company-owned. These decisions accorded the purveyors of ideas, religious or otherwise, "a preferred position," *Murdock* v. *Pennsylvania, supra* at 115, even to the extent of relieving them from an unhampering and non-discriminatory duty of bearing their share of the cost of maintaining the peace and the other amenities of a civilized society. Constitutional privileges having such a reach ought not to depend upon a State court's notion of the extent of "dedication" of private property to public purposes. Local determinations of such technical matters govern controversies affecting property. But when decisions by State courts involving local matters are so interwoven with the decision of the question of Constitutional rights that one necessarily involves the other, State determination of local questions cannot control the Federal Constitutional right.

A company-owned town gives rise to a net-work of property relations. As to these, the judicial organ of a State has the final say. But a company-owned town is a town. In its community aspects it does not differ from other towns. These community aspects are decisive in

adjusting the relations now before us, and more particularly in adjudicating the clash of freedoms which the Bill of Rights was designed to resolve—the freedom of the community to regulate its life and the freedom of the individual to exercise his religion and to disseminate his ideas. Title to property as defined by State law controls property relations; it cannot control issues of civil liberties which arise precisely because a company town is a town as well as a congeries of property relations. And similarly the technical distinctions on which a finding of "trespass" so often depends are too tenuous to control decision regarding the scope of the vital liberties guaranteed by the Constitution.

Accordingly, as I have already indicated, so long as the scope of the guarantees of the Due Process Clause of the Fourteenth Amendment by absorption of the First remains that which the Court gave to it in the series of cases in the October Term, 1942, the circumstances of the present case seem to me clearly to fall within it. And so I agree with the opinion of the Court, except that portion of it which relies on arguments drawn from the restrictions which the Commerce Clause imposes on State regulation of commerce. It does not seem to me to further Constitutional analysis to seek help for the solution of the delicate problems arising under the First Amendment from the very different order of problems which the Commerce Clause presents. The latter involves an accommodation between National and State powers operating in the same field. Where the First Amendment applies, it is a denial of all governmental power in our Federal system.

Mr. Justice Reed, dissenting.

Former decisions of this Court have interpreted generously the Constitutional rights of people in this Land to

exercise freedom of religion, of speech and of the press.[1]
It has never been held and is not now by this opinion of
the Court that these rights are absolute and unlimited
either in respect to the manner or the place of their ex-
ercise.[2] What the present decision establishes as a prin-
ciple is that one may remain on private property against
the will of the owner and contrary to the law of the state
so long as the only objection to his presence is that he is
exercising an asserted right to spread there his religious
views. See *Marrone* v. *Washington Jockey Club*, 227
U. S. 633. This is the first case to extend by law the priv-
ilege of religious exercises beyond public places or to pri-
vate places without the assent of the owner. Compare
*Martin* v. *Struthers,* 319 U. S. 141.

As the rule now announced permits this intrusion, with-
out possibility of protection of the property by law, and
apparently is equally applicable to the freedom of speech
and the press, it seems appropriate to express a dissent to
this, to us, novel Constitutional doctrine. Of course, such
principle may subsequently be restricted by this Court to
the precise facts of this case—that is to private property
in a company town where the owner for his own advantage
has permitted a restricted public use by his licensees and
invitees. Such distinctions are of degree and require new
arbitrary lines, judicially drawn, instead of those hitherto
established by legislation and precedent. While the power

---

[1] *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496;
*Schneider* v. *State,* 308 U. S. 147; *Thornhill* v. *Alabama,* 310 U. S. 88;
*Cantwell* v. *Connecticut,* 310 U. S. 296; dissent of Chief Justice Stone
in *Jones* v. *Opelika,* 316 U. S. 584, 600, adopted as the opinion of the
Court, 319 U. S. 103; *Jamison* v. *Texas,* 318 U. S. 413; *Largent* v.
*Texas,* 318 U. S. 418; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Martin*
v. *Struthers,* 319 U. S. 141; *Follett* v. *McCormick,* 321 U. S. 573.

[2] *Schenck* v. *United States,* 249 U. S. 47; *Gitlow* v. *New York,* 268
U. S. 652; *Near* v. *Minnesota,* 283 U. S. 697; *Cantwell* v. *Connecticut,*
310 U. S. 296; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Prince*
v. *Massachusetts,* 321 U. S. 158.

of this Court, as the interpreter of the Constitution to determine what use of real property by the owner makes that property subject, at will, to the reasonable practice of religious exercises by strangers, cannot be doubted, we find nothing in the principles of the First Amendment, adopted now into the Fourteenth, which justifies their application to the facts of this case.[3]

Both Federal and Alabama law permit, so far as we are aware, company towns. By that we mean an area occupied by numerous houses, connected by passways, fenced or not, as the owners may choose. These communities may be essential to furnish proper and convenient living conditions for employees on isolated operations in lumbering, mining, production of high explosives and large-scale farming. The restrictions imposed by the owners upon the occupants are sometimes galling to the employees and may appear unreasonable to outsiders. Unless they fall under the prohibition of some legal rule, however, they are a matter for adjustment between owner and licensee, or by appropriate legislation. Compare *Western Turf Assn.* v. *Greenberg*, 204 U. S. 359.

Alabama has a statute generally applicable to all privately owned premises. It is Title 14, § 426, Alabama Code 1940 which so far as pertinent reads as follows:

"Trespass after warning.—Any person who, without legal cause or good excuse, enters into the dwelling house or on the premises of another, after having been warned, within six months preceding, not to do so; or any person, who, having entered into the dwelling house or on the premises of another without having been warned within six months not to do so, and fails or refuses, without legal

---

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." First Amendment to the Constitution.

cause or good excuse, to leave immediately on being ordered or requested to do so by the person in possession, his agent or representative, shall, on conviction, be fined not more than one hundred dollars, and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than three months."

Appellant was distributing religious pamphlets on a privately owned passway or sidewalk thirty feet removed from a public highway of the State of Alabama and remained on these private premises after an authorized order to get off. We do not understand from the record that there was objection to appellant's use of the nearby public highway and under our decisions she could rightfully have continued her activities a few feet from the spot she insisted upon using. An owner of property may very well have been willing for the public to use the private passway for business purposes and yet have been unwilling to furnish space for street trades or a location for the practice of religious exhortations by itinerants. The passway here in question was not put to any different use than other private passways that lead to privately owned areas, amusement places, resort hotels or other businesses. There had been no dedication of the sidewalk to the public use, express or implied. Alabama so decided and we understand that this Court accepts that conclusion. Alabama, also, decided that appellant violated by her activities the above-quoted state statute.

The Court calls attention to the fact that the owners of public utilities, bridges, ferries, turnpikes and railroads are subject to state regulation of rates and are forbidden to discriminate against interstate commerce. This is quite true but we doubt if the Court means to imply that the property of these utilities may be utilized, against the companies' wishes, for religious exercises of the kind in question.

A state does have the moral duty of furnishing the opportunity for information, education and religious enlightenment to its inhabitants, including those who live in company towns, but it has not heretofore been adjudged that it must commandeer, without compensation, the private property of other citizens to carry out that obligation. Heretofore this Court has sustained the right of employees, under an appropriate statute, protecting full freedom of employee organization, to solicit union membership in nonworking time on the property of an employer and against his express prohibition. This is because the prohibition is an impediment to the right of organization which is protected by a statute which governs a relation between employers and employees if and when the latter are admitted to the employers' premises as licensees. It was recognized in the opinion that the freedom of solicitation was the result of a regulatory statute and was not a Constitutional right. *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, 803. In the area which is covered by the guarantees of the First Amendment, this Court has been careful to point out that the owner of property may protect himself against the intrusion of strangers. Although in *Martin* v. *Struthers,* 319 U. S. 141, an ordinance forbidding the summonsing of the occupants of a dwelling to receive handbills was held invalid because in conflict with the freedom of speech and press, this Court pointed out at page 147 that, after warning, the property owner would be protected from annoyance.[4]

---

[4] "The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas.

"Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off. General trespass after warning statutes exist in at least

The very Alabama statute which is now held powerless to protect the property of the Gulf Shipbuilding Corporation, after notice, from this trespass was there cited, note 10, to show that it would protect the householder, after notice. The right to communicate ideas was expressed by us in *Jamison* v. *Texas,* 318 U. S. 413, 416, as follows: "But one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the Constitutional right to express his views in an orderly fashion."

Our Constitution guarantees to every man the right to express his views in an orderly fashion. An essential element of "orderly" is that the man shall also have a right to use the place he chooses for his exposition. The rights of the owner, which the Constitution protects as well as the right of free speech, are not outweighed by the interests of the trespasser, even though he trespasses in behalf of religion or free speech. We cannot say that Jehovah's Witnesses can claim the privilege of a license, which has never been granted, to hold their meetings in other private places, merely because the owner has admitted the public to them for other limited purposes. Even though we have reached the point where this Court is required to force private owners to open their property for the practice there of religious activities or propaganda dis-

---

twenty states, while similar statutes of narrower scope are on the books of at least twelve states more. We know of no state which, as does the Struthers ordinance in effect, makes a person a criminal trespasser if he enters the property of another for an innocent purpose without an explicit command from the owners to stay away. The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed. This or any similar regulation leaves the decision as to whether distributers of literature may lawfully call at a home where it belongs—with the homeowner himself." *Martin* v. *Struthers,* 319 U. S. 141, 147–48.

tasteful to the owner, because of the public interest in freedom of speech and religion, there is no need for the application of such a doctrine here. Appellant, as we have said, was free to engage in such practices on the public highways, without becoming a trespasser on the company's property.

The CHIEF JUSTICE and MR. JUSTICE BURTON join in this dissent.