[L.A. No. 29866. In Bank. Oct. 18, 1971.]

VAN NUYS PUBLISHING COMPANY, INC.,
Plaintiff and Appellant, v.
CITY OF THOUSAND OAKS, Defendant and Respondent.

818

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

## Counsel

Willard R. Pool for Plaintiff and Appellant.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin as Amici Curiae on behalf of Plaintiff and Appellant.

Hathaway, Clabaugh & Perrett, E. E. Clabaugh, Jr., Raymond C. Clayton and Paul D. Powers for Defendant and Respondent.

Ronald H. Bevins and Holden & Bevins as Amici Curiae on behalf of Defendant and Respondent.

## Opinion

**TOBRINER, J.**—Plaintiff Van Nuys Publishing Company instituted this action to enjoin defendant City of Thousand Oaks from enforcing a newly enacted "anti-littering" ordinance on the ground that the provision, on its face and as applied, constituted an unconstitutional abridgement of First Amendment rights. After initially issuing a preliminary injunction as requested by plaintiff, the trial court rendered judgment in favor of the city, upholding the constitutionality of the challenged ordinance. The publisher appeals from that decision.

■■■■ For the reasons discussed more fully below, we have concluded that the city's present, broadly phrased, anti-littering ordinance cannot be squared with established First Amendment precepts. Instead of drafting a narrow measure aimed specifically at those who litter or those who handle written materials irresponsibly so as to cause litter, the City of Thousand Oaks has, by the instant enactment, undertaken an extensive interference with the distribution and circulation of all types of written material; as such, the challenged provision unquestionably exhibits the familiar unconstitutional vice of "overbreadth," proscribing constitutionally protected activity along with "littering." The past 30 years of First Amendment adjudication, in both the United States Supreme Court and in this court, teach that this ordinance, by broadly curtailing a predominant means of direct person-to-person and house-to-house distribution of written material, instead of fash-

ioning its proscription precisely to the problem of littering, cannot withstand constitutional scrutiny.

Section 4 of city ordinance No. 98, the section attacked on this appeal,[1] provides in full: "No person may throw, cast, distribute, scatter, deposit, pass out, give away, circulate or deliver any handbill, dodger, circular, newspaper, paper, booklet, poster, other printed matter or advertising literature of any kind in the yard or grounds of any house, building structure, on any porch, doorstep or vestibule, in any public hallway, or upon any vacant lot or other private property without having first obtained permission of the owner or of an adult resident or occupant thereof." Violators of this ordinance are guilty of a misdemeanor.

■ The problem of accumulating litter constitutes a major concern for

---

[1]Ordinance 98 is entitled "An Ordinance of the City of Thousand Oaks Declaring the Throwing or Distributing of Printed Matter on Public and Private Property Without Consent to be a Public Nuisance and Unlawful." It provides in full: "The City Council of the City of Thousand Oaks does ordain as follows:

"Section 1. The City Council of the City of Thousand Oaks finds and determines that entire communities within the City and a considerable number of citizens are adversely affected by persons, without consent, throwing, casting, distributing, scattering and depositing handbills, dodgers, circulars, newspapers, booklets, posters, printed matter and advertising literature upon public and private property. These acts are declared to constitute a public nuisance.

"Section 2. No person may throw, cast, distribute, scatter, deposit or place upon any public place within the City, including but not limited to streets, alleys, public parks and school grounds, any handbill, dodger, circular, newspaper, paper, booklet, poster or any other printed matter or advertising literature of any kind; provided, however, the same may be personally delivered to those who are willing to accept the same.

"Section 3. No person may throw, distribute or place in or on any automobile or other vehicle in the City any handbill, dodger, circular, newspaper, paper, booklet, poster, or any other printed matter or advertising literature without first having obtained permission of the owner or person in possession thereof.

"Section 4. No person may throw, cast, distribute, scatter, deposit, pass out, give away, circulate or deliver any handbill, dodger, circular, newspaper, paper, booklet, poster, other printed matter or advertising literature of any kind in the yard or grounds of any house, building structure, on any porch, doorstep or vestibule, in any public hallway, or upon any vacant lot or other private property without having first obtained permission of the owner or of an adult resident or occupant thereof.

"Section 5. If a section of this ordinance is invalid, all valid sections that are severable from the invalid section remains [sic] in effect. If a section of this ordinance is invalid in one or more of its applications, the section remains in effect in all valid applications that are severable from the invalid applications.

"Section 6. Any person violating any of the provisions of this ordinance shall be guilty of a misdemeanor and upon conviction thereof shall be punishable by a fine of not more than Five Hundred Dollars ($500.00) or by imprisonment in the county jail for a period of not more than six months, or by both such fine and imprisonment."

Only section 4 of the ordinance is attacked on this appeal and, therefore, we naturally confine our attention to this portion of the ordinance. For convenience, however, we shall hereinafter utilize the term "ordinance" and "section 4" interchangeably, unless otherwise specified.

many modern municipalities, and the City of Thousand Oaks' avowed goal in enacting the present legislation—the reduction of litter throughout the community—is, of course, a legitimate and, indeed an increasingly urgent, government objective. In attempting to achieve this unquestionably valid goal through a broad proscription of the dissemination of written literature, however, the instant ordinance collides with the constitutionally enshrined rights of freedom of speech and press. Although recent cases have consistently warned of "the 'chilling effect' upon the exercise of First Amendment freedoms generated by . . . [statutory] overbreadth" (*Walker* v. *City of Birmingham* (1967) 388 U.S. 307, 345 [18 L.Ed.2d 1210, 1234, 87 S.Ct. 1824] (Brennan, J., dissenting); see, e.g. *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29, 85 S.Ct. 1116]), and have consequently admonished legislators that "[p]recision *of regulation must be the touchstone in an area so closely touching our most precious freedoms*" (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328]), (italics added), the present section adopts a "broad brush" solution to litter control and thereby discloses its complete insensitivity to the constitutional freedoms it endangers.

■ The right to "distribute," "pass out," "circulate," or otherwise disseminate ideas and written material has, of course, long been recognized to constitute an integral part of the right of free speech. "The right of free speech necessarily embodies the means used for its dissemination because the right is worthless in the absence of a meaningful method of its expression . . . . The right to speak freely must encompass inherently the right to communicate; . . . it contemplates *effective* communication." (*Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276, 284 [29 Cal.Rptr. 1, 379 P.2d 481]; see, e.g., *Martin* v. *City of Struthers* (1943) 319 U.S. 141, 143 [87 L.Ed. 1313, 1316-1317, 63 S.Ct. 862] ("[T]his freedom [of speech and press] embraces *the right to distribute literature,* [citation], and necessarily protects the right to receive it."): *Lovell* v. *City of Griffin* (1937) 303 U.S. 444, 452 [82 L.Ed. 949, 954, 58 S.Ct. 666] (" '[L]*iberty of circulating is as essential to . . . freedom [of speech and press] as liberty of publishing*; indeed, without the circulation, the publication would be of little value.' [Citation].") (Italics added.))

■ This right to distribute newspapers, pamphlets, or any protected material,[2] does not, of course, imply a constitutional right to litter. But the

---

[2]The instant ordinance is not confined solely to the distribution of commercial advertising, but, by its explicit terms, applies to the dissemination of "any handbill, dodger, circular, newspaper, paper, booklet, poster or advertising material," thus covering the distribution of constitutionally protected material. We thus have no occasion to pass on the validity of a statute which was so restricted. (Cf. *Valentine* v.

instant provision goes far beyond proscribing those activities which constitute littering or necessarily cause litter; in addition to proscribing the "throwing," "casting," or "scattering," i.e., "littering," of paper onto property without consent, the section goes on to prohibit *all* "distributing," "passing out," "giving away," "circulating," or "delivering" of such written material without a property owner's consent. Thus the ordinance does not limit its criminal sanction to those who strew papers on lawns or sidewalks, but by its terms covers those who merely enter on property to distribute pamphlets to others who may be there, as well as those who, in delivering pamphlets, take care to secure their messages so as to eliminate the hazards of litter.

Over 30 years ago in *Schneider* v. *State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146], the United States Supreme Court rejected as incompatible with the First Amendment a claim that a municipality could broadly curtail the dissemination of written literature in order to conrol litter, essentially the same proposition now unearthed by the City of Thousand Oaks. The *Schneider* court spoke in unambiguous terms: "We are of the opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press. The constitutional protection does not deprive a city of all power to prevent street littering. There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw paper on the streets. [Par.] [T]he public convenience in respect of cleanliness of the streets does not justify an exertion of police power which invades the free communication of information and opinion secured by the Constitution." (308 U.S. at pp. 162-163 [84 L.Ed. at pp. 165-166].)

The city seeks to avoid the force of *Schneider's* broad constitutional pronouncement by emphasizing two distinctions between the provision at issue in this case and the provision invalidated in *Schneider*. First, the city suggests that whereas the *Schneider* ordinance barred the distribution of pamphlets and handbills on the public streets, assertedly the "traditional" grounds for exercising First Amendment rights, the instant ordinance applies only to distribution at private residences.[3] Second, the city points out

---

*Chrestensen* (1942) 316 U.S. 52 [86 L.Ed. 1262, 62 S.Ct. 920]; *Breard* v. *City of Alexandria* (1951) 341 U.S. 622 [95 L.Ed. 1233, 71 S.Ct. 920].)

[3]Although the language of section 4, covering distribution "on the grounds of any . . . building structure, . . . [in] any vestibule, . . . any public hallway, [and on]

that unlike the provision invalidated in *Schneider,* the instant ordinance does not prohibit *all* distribution, but "merely" conditions distribution on the *prior* consent of the occupant of the property where distribution is to take place. The city contends that these differences mandate a different constitutional result than was reached in *Schneider,* but we cannot agree.

■ Although the public streets, parks and other public places have sometimes been characterized as the "traditional" grounds for the exercise of free expression (see, e.g., *Hague* v. *C.I.O.* (1939) 307 U.S. 496, 515-516 [83 L.Ed. 1423, 1436-1437, 59 S.Ct. 954]), courts have long recognized that, in practice, house-to-house distribution of written material constitutes one of the principal means of implementing the First Amendment right of communication, and historically have afforded constitutional protection to such distribution. In a separate section of its decision in *Schneider* v. *State* (1939) 308 U.S. 147, 164 [84 L.Ed. 155, 166, 60 S.Ct. 146], for example, after observing that ". . . pamphlets have proved most effective instruments in the dissemination of opinion," the court pointed out that ". . . perhaps the most effective way of bringing them to the notice of individuals is their *distribution at the homes of people.*" (Italics added.) The court therefore invalidated, as incompatible with the First Amendment, a local ordinance which required house-to-house distributors of pamphlets to obtain a license prior to disseminating their material. "To require a censorship through license which makes impossible *the free and unhampered distribution of pamphlets* strikes at the very heart of the constitutional guarantees." (Italics added: 308 U.S. at p. 164 [84 L.Ed. at p. 166]. See also *Lovell* v. *City of Griffin* (1938) 303 U.S. 444 [82 L.Ed. 949, 58 S.Ct. 666]; *Cantwell* v. *Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352].)

In *Martin* v. *City of Struthers* (1943) 319 U.S. 141, 145-146 [87 L.Ed. 1313, 1318, 63 S.Ct. 862], the court developed the significant role fulfilled by house-to-house distribution of ideas. "The widespread use of this method of communication by many groups espousing various causes attests its major importance . . . . Many of our most widely established religious organizations have used this method of disseminating their doctrines, and laboring groups have used it in recruiting their members. The federal government, in its current war bond selling campaign, encourages groups of citizens to distribute advertisements and circulars from house to house. Of course, as every person acquainted with political life knows, door to door

any vacant lot," by no means clearly excludes the ordinance's application to distribution on the grounds of public and quasi-public buildings, we need not determine the precise scope of the challenged ordinance since we have concluded that the enactment is in any event invalid even if limited only to distribution on private residential ·property. .

campaigning is one of the most accepted techniques of seeking popular support, while the circulation of nominating papers would be greatly handicapped if they could not be taken to the citizens in their homes. Door to door distribution of circulars is essential to the poorly financed causes of little people." (Fns. omitted.)

Finding this "right to disseminate information door-to-door" substantially impaired by a local ordinance which forbade distributors of literature from ringing doorbells or sounding door knockers, the *Martin* court invalidated the provision as incompatible with the First Amendment. In *Marsh* v. *Alabama* (1946) 326 U.S. 501, 505 [90 L.Ed. 265, 267, 66 S.Ct. 276], the court characterized its decision in *Martin* as holding broadly that "the preservation of a free society is so far dependent upon the right of each individual citizen to receive such literature as he himself might desire that a *municipality could not,* without jeopardizing that vital individual freedom, *prohibit door to door distribution of literature."* (Italics added.)

The city contends, however, that while these precedents may determine that it cannot constitutionally prohibit all house-to-house distribution of protected literature, the cases do not invalidate the instant ordinance, which does not ban all distribution, but "merely" conditions distribution on the prior consent of the occupant of the property where distribution is to take place. In the context of private residences, however, a requirement that a distributor obtain consent prior to the delivery of written material will, as a practical matter, frequently operate to curtail completely this means of communication. The present enactment does not restrict itself to persons who distribute matter on a regular basis, but applies also to those, such as local political candidates or neighborhood groups, who may distribute literature on only a single occasion. As to these distributors, section 4's "prior consent" requirement may well make canvassing prohibitively time-consuming and expensive, since successful communication will often require repeated visits until the distributors find someone at the residence. In this day of rapidly increasing political campaign expenses, attributable to the great cost of television and other mass media advertising, house-to-house distribution of campaign literature remains one of the few available channels of communication open to the less-than-wealthy political candidate;[4] in practical terms, the instant ordinance would go far to elimi-

---

[4]Justice Black's observation in *Kovacs* v. *Cooper* (1949) 336 U.S. 77, 103 [93 L.Ed. 513, 531, 69 S.Ct. 448, 10 A.L.R.2d 608] (dissenting opinion) that an effective ban on the use of sound trucks would assure "preference in the dissemination of ideas . . . [to] those who have money enough to buy advertising from newspapers, radios or moving pictures" has even greater validity when applied to the practical curtailment of political canvassing.

nate such communication. This consequence, of course, inescapably collides with constitutionally enshrined rights.

The city urges, however, that while an individual may have a constitutional right to distribute material to *willing* recipients, he has no right to force his ideas on *unwilling* subjects. Relying heavily on *Di Lorenzo* v. *City of Pacific Grove* (1968) 260 Cal.App.2d 68 [67 Cal.Rptr. 3], which upheld a similarly worded ordinance in the face of a constitutional attack, the defendant characterizes the instant ordinance's requirement of "prior consent" as doing no more than properly protecting the rights of unwilling "listeners." To support its approval of an analogous "prior consent" provision,[5] the *Di Lorenzo* court cited a passage from the United States Supreme Court decision of *Kovacs* v. *Cooper* (1949) 336 U.S. 77, 87 [93 L.Ed. 513, 522, 69 S.Ct. 448, 10 A.L.R.2d 608], declaring: "The right of free speech is guaranteed every citizen that he may reach the minds of willing listeners and to do so there must be opportunity to win their attention."

Although *Di Lorenzo* stressed only the "willing listener" language of the above quotation, we believe that in so doing the Court of Appeal overlooked the principal thrust of the entire statement; in order for one to reach the *minds* of willing listeners, the *Kovacs* court recognized that the speaker, the disseminator of ideas, must be given an "opportunity *to win their attention.*" This object, of course, is all the distributor of pamphlets seeks to accomplish: "to win the attention," and perhaps ultimately "to reach the minds," of those willing to read the disseminated material. A principal vice of the instant ordinance is that it withdraws, as a matter of municipal policy, the possibility of communication between a distributor and those "willing" recipients who are not present to give personal consent to the delivery of distributed literature. (Cf. *Martin* v. *City of Struthers* (1943) 319 U.S. 141, 143-144 [87 L.Ed. 1313, 1316-1317, 63 S.Ct. 862].)

We do recognize, of course, that the state does have a legitimate interest in protecting individuals from having undesired material forced upon them, and, moreover, that this interest in personal privacy takes on special significance in the context of private residences. (See *Rowan* v.

---

[5]The ordinance at issue in *Di Lorenzo* provided: "It shall be unlawful for any person, firm, or corporation, or any agent or employee of any person, firm or corporation to throw into, leave upon, or scatter onto any residential property in the City of Pacific Grove without the consent of the owner thereof or his agent, or the occupant of said private property any newspaper, handbill, pamphlet, circular, dodger, or any advertising sheet or matter devised or intended to promote any commercial or money-making activity."

*Post Office Department* (1970) 397 U.S. 728, 736 [25 L.Ed.2d 736, 742, 90 S.Ct. 1484].) The instant ordinance, however, goes considerably beyond preserving a homeowner's individual choice, since it prohibits distribution to those occupants who have raised no objection to the material as well as to those who have. Instead of merely protecting the "unwilling listener," as the city contends, the present ordinance thus impairs a distributor's opportunity "to win the attention" of all uncommitted "listeners."

Furthermore, the city's professed goal of protecting "unwilling listeners" could be equally served by a more narrowly drawn provision, which simply prohibited a distributor from delivering material to any occupant who had expressed an objection to such distribution. Such an ordinance, placing the initial burden on the homeowner instead of the distributor, would not, in effect, destroy First Amendment rights. Given the availability of this less restrictive alternative, we believe the present ordinance is unquestionably unconstitutional. (See e.g., *Sherbert* v. *Verner* (1963) 374 U.S. 398, 407 [10 L.Ed.2d 965, 972, 83 S.Ct. 1790]; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 337 [38 Cal.Rptr. 625, 392 P.2d 385].)

■ Several United States Supreme Court decisions support our conclusion that a proper accommodation of the competing First Amendment and privacy values at issue requires that the initial burden be placed on the homeowner to express his objection to the distribution of material. In *Martin* v. *City of Struthers* (1943) 319 U.S. 141 [87 L.Ed. 1313, 63 S.Ct. 862], the court confronted a local ordinance which prohibited distributors of literature from ringing any doorbell or sounding any doorknocker, even though the homeowner had not expressed any objection to such communication. In invalidating the ordinance, the *Martin* court made clear that the provision's principal vice lay in its prohibition of communication when there had been no objection voiced by the householder.

The *Martin* court said, "Traditionally the American law punishes persons who enter onto the property of another *after having been warned by the owner to keep off. . . .* We know of no state which, as does the Struthers ordinance in effect, makes a person a criminal trespasser if he enters property of another for an innocent purpose without *an explicit command of the owner to stay away.* The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities which would make it an offense for any person to ring the bell of a householder *who has appropriately indicated that he is unwilling to be disturbed.* This *or any similar regulation* leaves the decision as to whether distributors of literature may lawfully call at a home where it belongs—with the home-

owner himself. *A city can punish those who call at a home in defiance of the previously expressed will of the occupant . . . .*" (Italics added; fns. omitted.) (319 U.S. at pp. 147-148 [87 L.Ed. at p. 1319].)

More recently, in *Rowan* v. *Post Office Department* (1970) 397 U.S. 728 [25 L.Ed.2d 736, 90 S.Ct. 1484], the court addressed a federal statute which established a procedure under which an individual, who received mail which he considered "erotically arousing or sexually provocative," could lodge his objection to such mail with the Post Office Department, which would then communicate the complaint to the sender of the material. The statute provided that after notice of the objection had been given, the sender could not continue to send such mail to the objecting householder; criminal penalties were provided for the violation of the prohibition. Several mailers attacked this statute on First Amendment grounds, claiming the provision violated their right to distribute literature. In rejecting this contention the court emphasized that, under the federal statute, distribution was barred only *after* the householder had first voiced his objection: "The Court has traditionally respected the right of a householder to bar, *by order or notice,* solicitors, hawkers, and peddlers from his property. See *Martin* v. *Struthers* . . . . In this case the mailer's right to communicate is circumscribed only by an *affirmative act* of the addressee giving notice that he wishes no further mailings from that mailer." (Italics added.) (397 U.S. at p. 737 [25 L.Ed.2d at p. 743].)

The teachings of *Martin* and *Rowan* establish sound guidelines for the formulation of regulations in this area. ■ To preserve a homeowner's control over his "castle," a city may certainly prohibit a distributor from delivering matter "in defiance of the previously expressed will of the occupant" (*Martin* v. *City of Struthers* (1943) 319 U.S. 141, 148 [87 L.Ed. 1313, 1319, 63 S.Ct. 862]). The homeowner can, of course, express his objection to distribution in a variety of ways: he might, for example, post a sign on his property or, in the case of "regular" distributors, write or telephone the disseminator to instruct him to discontinue delivery. Alternatively, the city might adopt the *Rowan* procedure as a model, and establish a municipal office both to channel complaints to offending distributors and to monitor distributors' responses. The choice of method, of course, remains with each municipality. ■ A city cannot, however, preserve "privacy" (or attack "litter") by prohibiting all distribution without "prior consent," as the City of Thousand Oaks has attempted to do here.[6] The potentially devastating effect on First Amendment rights of such

---

[6]*Di Lorenzo* v. *City of Pacific Grove* (1968) 260 Cal.App.2d 68 [67 Cal.Rptr. 3] is disapproved insofar as it is inconsistent with the views expressed above.

a provision necessitates that the city adopt a less restrictive alternative method to achieve its legitimate goals.

In sum, though attempting to meet the very real problem of accumulation of litter, the present penal enactment goes substantially beyond what is necessary to achieve the city's anti-littering objecive and, in so doing, treads directly on First Amendment rights. As the United States Supreme Court observed in *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 97-98 [84 L.Ed. 1093, 1099-1100, 60 S.Ct. 736], there is· a "pervasive threat inherent in [the] very existence . . . [of] a penal statute . . . which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute . . . results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview."[7]

 Thus, although in other contexts we would normally strive to construe the language of the ordinance narrowly to preserve its constitutionality, we believe that its "chilling effect" on sensitive First Amendment rights forecloses its rehabilitation and compels its demise as unconstitutional on its face. The very presence of the ordinance on the books endangers the free distribution of ideas. The would-be lay pamphleteer does not turn to court decisions to find a judicial interpretation of the ordinance; he reads the ordinance. Its cold words of absolute prohibition may stay his publication.

Only the stout-hearted will brave prosecution for the sake of publication. As the high court observed in *Dombrowski* v. *Pfister* (1965) 380 U.S. 479 [14 L.Ed.2d 22, 85 S.Ct. 1116], "If the rule were otherwise [than invalidating the statute as a whole], the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." (*Id.* at p. 487 [14 L.Ed.2d at p. 29].) "Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendant value to all society, and not merely

---

[7]"The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchannelled delegation of legislative powers but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328]. See generally Note, *The First Amendment Overbreadth Doctrine* (1970) 83 Harv.L.Rev. 844.)

to those exercising their rights—might be the loser." (*Id.* at p. 486 [14 L.Ed.2d at p. 28]; see, e.g., *United States* v. *Robel* (1967) 389 U.S. 258, 266 [19 L.Ed.2d 508, 515, 88 S.Ct. 419]; *Aptheker* v. *Secretary of State* (1964) 378 U.S. 500, 514 [12 L.Ed.2d 992, 1001, 84 S.Ct. 1659].)

The gravity of the dangers inherent in the instant ordinance is perhaps best appreciated through a brief glance back to our country's revolutionary beginnings. If the present law had been in force in eighteenth century America, the colonies may well have preserved the cleanliness of their streets only at the price of stilling the dissident voices of such pamphleteers as Thomas Paine, Andrew Eliot and John Carmichael.[8] Without the unique contribution of the political pamphlet,[9] our country's founders might have been deprived of *Common Sense's* vigorous call to "[S]tand forth! Every spot of the old work is overrun with oppression. Freedom hath been hunted round the Globe. Asia and Africa have long expelled her. Europe regards her like a stranger, and England hath given her warning to depart. O! receive the fugitive, and prepare in time an asylum for mankind."[10]

The judgment is reversed.

Wright, C. J., Peters, J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I dissent. It is a cardinal principle of constitutional law that if " 'the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution. [Citations.]' " (*San Francisco Unified School Dist.* v. *Johnson,* 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669] [Tobriner, J.].) Thus, in a recent case involving the constitutionality of a municipal trespass ordinance, we stated that "in order . . . to save the constitution-

---

[8]Thomas Paine, Common Sense (Philadelphia, 1776); Andrew Eliot, A Sermon Preached before His Excellency Francis Bernard (Boston 1765); John Carmichael, A Self-Defensive War Lawful (Lancaster, Mass., 1775). See generally *Pamphlets of the American Revolution* (Bailyn ed. 1965).

[9]The peculiar virtues of this medium of communication have been aptly described by George Orwell: "The pamphlet is a one-man show. One has complete freedom of expression, including, if one chooses, the freedom to be scurrilous, abusive and seditious; or, on the other hand, to be more detailed, serious and 'highbrow' than is ever possible in a newspaper or in most kinds of periodical. At the same time, since the pamphlet is always short and unbound, it can be produced much more quickly than a book and . . . can reach a bigger public. Above all, the pamphlet does not have to follow any prescribed pattern . . . . All that is required of it is that it shall be topical, polemical and short." (George Orwell, Introduction in 1 British Pamphleteers 15 (Orwell & Reynolds eds. 1948).)

[10]Thomas Paine, *Common Sense* (Philadelphia 1776) in 1 The Writings of Thomas Paine 100-101 (Conway ed. 1894-1896).

ality of [the ordinance], we must construe it to encompass both the protection of the property owner's legitimate interest in preventing physical interference with the business use, disturbances of the peace . . . or physical obstruction of the premises . . . as well as the preservation of 'an effective place for the dissemination of ideas.' [Citation.]" (*In re Cox*, 3 Cal.3d 205, 223 [90 Cal.Rptr. 24, 474 P.2d 992] [Tobriner, J.].)

In the instant case, the majority opinion facilely ignores the foregoing principles and declares City's anti-litter ordinance unconstitutional "on its face." In my view, we must (as in *Cox, supra*), construe that ordinance to encompass both the legitimate anti-litter objectives of the city and private property owner as well as the preservation of First Amendment rights. As so construed, the ordinance is valid and enforceable.

The majority claim that City's ordinance constitutes an "extensive interference" with the distribution of "protected" material, instead of being "aimed specifically at those who litter." To the contrary, properly construed to save its constitutionality, the ordinance is restricted solely to those who litter, for it forbids only that distribution, scattering, etc., which occurs in private yards, grounds, porches, doorsteps, vestibules, hallways, vacant lots or other private property, without the owner's prior consent. By its terms, the ordinance *would* permit the direct distribution of "protected" or other material to any householder consenting to receive it, for the ordinance only applies to those "distributions" made "without having first obtained permission . . . ." Thus, nothing in the ordinance would prevent the distributor from announcing his presence and offering his handouts to the householder.

The cases cited by the majority indicate that an ordinance could not properly forbid *person-to-person* distribution on private property of protected material, such as religious tracts or political pamphlets. (See *Schneider* v. *State,* 308 U.S. 147, 164 [84 L.Ed. 155, 166, 60 S.Ct. 146]; *Martin* v. *City of Struthers,* 319 U.S. 141, 145-146 [87 L.Ed. 1313, 1318, 63 S.Ct. 862].) These cases, however, would not bar a municipality from prohibiting the distribution of such material by scattering it on private grounds or leaving it on one's doorstep where, by its very presence, it could cause a serious litter problem as well as constituting an open invitation to burglary.

But even were we to conclude that these intrusions upon the private householder were justified by some need to afford the distributor of *protected materials* an uninvited access to private premises, we could nonetheless reasonably construe City's ordinance as applying only to

nonprotected, commercial material, thereby saving the constitutionality of the ordinance in its most common application.

The authorities uniformly recognize that commercial soliciting or advertising may be regulated by ordinances of the type involved herein. (*Breard* v. *City of Alexandria, La.,* 341 U.S. 622, 641-642 [95 L.Ed. 1233, 1247-1248, 71 S.Ct. 920]; *Schneider* v. *State, supra,* 308 U.S. 147, 165 [84 L.Ed. 155, 166, 60 S.Ct. 146].) Accordingly, it has been noted that "Ordinances prohibiting the distribution, throwing or casting of handbills, circulars, cards or other advertising matter upon streets and public places have been construed as applying only to commercial and business advertising matter . . . ." (7 McQuillan, Municipal Corporations, § 24.446, at pp. 430-431, citing cases.) City's ordinance could reasonably be so construed.

The majority accuse City's ordinance of exhibiting the vice of "overbreadth," a common form of legislative overreaction to the solution of a problem. Ironically, the majority, by declaring the ordinance invalid on its face without considering the reasonable alternative constructions which I have proposed, have overreacted in a similar manner. Accordingly, I respectfully dissent from their opinion.

McComb, J., concurred.

Respondent's petition for a rehearing was denied November 17, 1971. McComb, J., and Burke, J., were of the opinion that the petition should be granted.